[No. S112621. Mar. 9, 2006.]

EUGENE EVANS et al., Plaintiffs and Appellants, v.
CITY OF BERKELEY et al., Defendants and Respondents.

**COUNSEL**

Law Offices of Jonathan D. Gordon and Jonathan D. Gordon for Plaintiffs and Appellants.

Pacific Legal Foundation, John H. Findley and Harold E. Johnson for Plaintiff and Appellant Tonatiuh Alvarez.

John H. Findley and Harold E. Johnson for Pacific Legal Foundation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Brad W. Dacus and Roger G. Ho for Pacific Justice Institute as Amicus Curiae on behalf of Plaintiffs and Appellants.

Bartko, Zankel, Tarrant & Miller, William I. Edlund, Ramiz I. Rafeedie; and Andrew W. Fortin for California State Club Association and National Club Association as Amici Curiae on behalf of Plaintiffs and Appellants.

Eric R. Carleson for American Civil Rights Union as Amicus Curiae on behalf of Plaintiffs and Appellants.

Hughes Hubbard & Reed, William T. Bisset, George A. Davidson and Carla A. Kerr for Boy Scouts of America as Amicus Curiae on behalf of Plaintiffs and Appellants.

Kirton & McConkie and Alexander Dushku for The Church of Christ of Latter-Day Saints, National Catholic Committee on Scouting, Orestimba Presbyterian Church and Hope Chapel Christian Fellowship as Amici Curiae on behalf of Plaintiffs and Appellants.

Sweeney & Greene, James F. Sweeney and Eric Grant for California Catholic Conference as Amicus Curiae on behalf of Plaintiffs and Appellants.

Manuela Albuquerque, City Attorney, Matthew J. Orebic and Laura McKinney, Deputy City Attorneys, for Defendants and Respondents.

Munger, Tolles & Olson, Jerome C. Roth, Ailsa W. Chang; and Jon W. Davidson for Bay Area Lawyers for Individual Freedom and Lambda Legal Defense and Education Fund, Inc., as Amici Curiae on behalf of Defendants and Respondents.

Dennis J. Herrera, City Attorney, Therese Stewart, Burke Delventhal and Ellen Forman, Deputy City Attorneys, for City and County of San Francisco, California League of Cities and California State Association of Counties as Amici Curiae on behalf of Defendants and Respondents.

Heller Ehrman White & McAuliffe, Warrington S. Parker III; Miranda D. Junowicz and Oren Sellstrom for Anti-Defamation League and Lawyers' Committee for Civil Rights of the San Francisco Bay Area as Amici Curiae on behalf of Defendants and Respondents.

Morrison & Foerster, Mark W. Danis, M. Andrew Woodmansee; Jordan C. Budd, Watson Branch; Martha Matthews; and Margaret C. Crosby for ACLU Foundation of San Diego and Imperial Counties, ACLU Foundation of Southern California and ACLU Foundation of Northern California as Amici Curiae on behalf of Defendants and Respondents.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Richard M. Frank, Chief Assistant Attorney General, Louis Verdugo, Jr., Assistant Attorney General, Suzanne M. Ambrose and Timothy M. Muscat, Deputy Attorneys General, as Amici Curiae on behalf of Defendants and Respondents.

OPINION

**WERDEGAR, J.**—A city requested that a volunteer youth group affiliated with the Boy Scouts of America, in order to qualify for continued free use of berths in the city's marina, provide written assurance the group would not

discriminate against homosexuals or atheists wishing to participate in the group's program. The city, deeming the policy statement the group provided ambiguous and therefore insufficient, discontinued its subsidy. Members of the group sued, claiming, among other things, that the city's action violated their freedoms of speech and association. The trial court sustained the city's demurrer, and the Court of Appeal affirmed. We conclude the Court of Appeal correctly determined that the complaint does not establish a violation of plaintiffs' constitutional rights and affirm the lower court's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Because this case comes to us on a demurrer for failure to state a cause of action, we accept as true the well-pleaded allegations in plaintiffs' first amended complaint. " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187].) Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. (*Speegle* v. *Board of Fire Underwriters* (1946) 29 Cal.2d 34, 42 [172 P.2d 867].)" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) " '[A] complaint otherwise good on its face is subject to demurrer when facts judicially noticed render it defective.' [Citation.]" (*Joslin v. H.A.S. Ins. Brokerage* (1986) 184 Cal.App.3d 369, 374 [228 Cal.Rptr. 878]; see Code Civ. Proc., § 430.30, subd. (a).) The following facts appear from the allegations of the complaint and from judicially noticeable sources.

Plaintiffs are 14 individual adult and youth participants in the Berkeley Sea Scouts, suing for themselves and other program participants. The Berkeley Sea Scouts (Sea Scouts) are volunteers joining together in a nonprofit association with no formal administrative structure, no budget, and no employees. Adults, including some of the named plaintiffs, use Sea Scout vessels to teach sailing, seamanship, marine engine repair, electrical repair, woodworking, and other skills for a maritime career, as well as teamwork, to teenagers who pay no more than $7 a year to participate. Ethnic diversity is a hallmark of the Sea Scouts, and many youth participants are economically disadvantaged. Girls as well as boys participate, and the Sea Scouts have never actually discriminated against anyone on the basis of sexual orientation or religion.

According to the operative complaint, the Sea Scouts are "a subdivision of," or "associated/affiliated with," the national Boy Scouts of America (BSA). The Sea Scouts operate under what the complaint describes as BSA's "regional office," the Mount Diablo Council. Each Sea Scout "ship" functions

as the equivalent of a Boy Scout troop. BSA provides the group with a low-cost maritime liability insurance policy but gives it no direct funding. BSA, according to the complaint, follows a "policy of discriminating against homosexuals' and atheists' participation."[1]

In the late 1930's, Berkeley began giving BSA one or more free berths at its marina for use by the Sea Scouts, after the Mount Diablo Council permitted Berkeley to quarry rock from BSA property to build the marina and breakwater. The arrangement was formalized by city resolutions in 1945 and 1969 that required compliance with marina rules and regulations and allowed revocation on 30 days' written notice.

In March 1997, in response to requests from other nonprofit organizations for free berths, the city manager recommended and the Berkeley City Council adopted through resolution No. 58,859-N.S. (Resolution 58,859) a uniform policy for awarding free berths to nonprofit community service organizations.[2] Under the resolution, an organization seeking free berth space must "supply a beneficial public service," the benefit of which "greatly exceeds the value of the berth." The organization also must "demonstrate," through "[m]embership policy and practices," among other criteria, that it "promote[s] cultural and ethnic diversity." Resolution 58,859 goes on to specify that access to marina facilities may "not be predicated on a person's race, color, religion, ethnicity, national origin, age, sex, sexual orientation, marital status, political affiliation, disability or medical condition." The resolution provides for the Berkeley Waterfront Commission (Waterfront Commission) to review applications and make recommendations to the city council. Organizations receiving berthing subsidies are to have those subsidies reviewed annually by the city council after a review and recommendation by the Waterfront Commission.

---

[1] The complaint cites *Curran v. Mount Diablo Council of the Boy Scouts* (1998) 17 Cal.4th 670 [72 Cal.Rptr.2d 410, 952 P.2d 218], and *Boy Scouts of America v. Dale* (2000) 530 U.S. 640 [147 L.Ed.2d 554, 120 S.Ct. 2446], both of which describe BSA's doctrinal opposition to participation in scouting programs by atheists and known homosexuals.

[2] Resolution 58,859 is a "legislative enactment[] issued by or under the authority of . . . [a] public entity in the United States," of which notice may be taken under Evidence Code section 452, subdivision (b). (See *Cooke v. Superior Court* (1989) 213 Cal.App.3d 401, 416 [261 Cal.Rptr. 706] [county resolution increasing level of dental care for indigents], disapproved on another point in *County of San Diego v. State of California* (1997) 15 Cal.4th 68, 106, fn. 30 [61 Cal.Rptr.2d 134, 931 P.2d 312].) The operative complaint also alleges the existence and some of the terms of the resolution. We also take notice, as legislative history reflecting on the purposes of the enactment, of the city manager's memorandum to the mayor and city council recommending the resolution's adoption. (See *Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824, 848, fn. 6 [31 Cal.Rptr.3d 565, 115 P.3d 1212]; *Elsner v. Uveges* (2004) 34 Cal.4th 915, 929 & fn. 10 [22 Cal.Rptr.3d 530, 102 P.3d 915].)

· The continued provision of free marina berths to the Sea Scouts came up for review in the Waterfront Commission in early 1998. The commission expressed concern that BSA's policy of discrimination against homosexuals and atheists was in conflict with Resolution 58,859 and asked the Sea Scouts to provide a "local policy statement" ensuring nondiscrimination. The Sea Scouts, in negotiation with the Mount Diablo Council, approved a policy statement intended to satisfy Berkeley's requirements. In a letter to the waterfront manager, dated April 8, 1998, the Sea Scouts stated: "We will continue to comply with the Constitution of the United States of America, the laws of the State of California and the Berkeley Municipal Code—including Section 13.28.060 and City Council Resolution No. 58,85[9], N.S. [¶] . . . We actively recruit adult leaders and adolescents meeting the minimum age requirements without regard to sex, race, color, national origin, political affiliation, religious preference, marital status, physical handicap or medical condition. We believe that sexual orientation is a private matter, and we do not ask either adults or youths to divulge this information at any time."[3]

The Waterfront Commission recommended the city council continue the Sea Scouts' free berths. The city manager, however, recommended the council discontinue the free berths, based on an opinion by the city attorney concluding that continuation of the free berth subsidy to the Sea Scouts would violate both Resolution 58,859 and section 13.28.060 of the Berkeley Municipal Code, which prohibits discrimination based on sexual orientation in the use of city owned or supported facilities and services.[4]

In her opinion, which was provided to the council with the city manager's recommendation, the city attorney concluded the Sea Scouts' April 8, 1998, letter did not constitute compliance with Resolution 58,859 or Berkeley Municipal Code section 13.28.060. In the city attorney's view, the Sea Scouts' assertion in the April 8 letter that they considered sexual orientation to be "a private matter" did not state a policy that the group would not, in the future, discriminate on the basis of sexual orientation. According to the city attorney, the Sea Scouts said they were unwilling to state such an express policy "due to fear of losing their charter from the Boy Scouts." From her examination of this court's then recent opinion in *Curran v. Mount Diablo Council of the Boy Scouts, supra,* 17 Cal.4th 670, and her discussion with BSA's attorney in that case, the city attorney concluded that BSA requires

---

[3] The text of the Sea Scouts' April 8, 1998, letter appears in the appellate record only in plaintiffs' original complaint, which was superseded by amendment after the trial court granted judgment on the pleadings for Berkeley with leave to amend. Both parties, however, quote the letter's language in their briefing. The superseded allegation, it thus appears, was not made by mistake or inadvertence, and no potential dispute exists as to the letter's language, allowing its consideration on demurrer. (See *Reichert v. General Ins. Co.* (1968) 68 Cal.2d 822, 836 [69 Cal.Rptr. 321, 442 P.2d 377]; *Joslin v. H.A.S. Ins. Brokerage, supra,* 184 Cal.App.3d at p. 375.)

[4] Regarding judicial notice of the city attorney's opinion, see footnote 5, *post.*

local groups to adhere to its policy of excluding avowedly gay or atheistic members or adult leaders, even where a local nondiscrimination law requires otherwise. In light of BSA's policy, the city attorney concluded, the qualified language of the April 8 letter was insufficient to show compliance with Berkeley's ordinance and resolution.

The Berkeley City Council took up the matter on May 5, 1998. According to plaintiffs' complaint, at the May 5 meeting the city council was "made aware" that the Sea Scouts had never discriminated against gays or atheists and that the Sea Scout program served an ethnically and economically diverse group of young people. The city council nevertheless voted to end the berth subsidy.

According to the minutes of the May 5 council meeting, the free berths were discontinued "due to [BSA's] discriminatory policies against gays and atheists."[5] In a letter giving the Sea Scouts notice their free berths were cancelled, the Berkeley Waterfront Manager indicated the city council had denied free berths to the Sea Scouts because, in the complaint's words, the Sea Scouts "were associated with the national Boy Scouts of America organization which has a national policy of discriminating based on sexual orientation and atheism."

Because of its hostility to BSA, plaintiffs allege, Berkeley "decided to punish and intentionally discriminated against the completely innocent children and community volunteer[s]" of the Sea Scouts. Berkeley allegedly knew plaintiffs had, in the April 8, 1998, letter, "agreed not to discriminate against gays or atheists." The city used "[g]uilt by association," excluding plaintiffs from the free berth program solely because of BSA's policies, without ever determining that the Sea Scouts themselves "pose[d] the threat feared by the government"—discrimination in the use of publicly owned facilities. "Here, there is no evidence that Plaintiffs or any participant in the Berkeley Sea Scouts program was going to unlawfully discriminate against anyone, yet they have been penalized by the deprivation of the continued free use of the public facilities."

---

[5] Berkeley asserts the minutes are noticeable as a legislative enactment (Evid. Code, § 452, subd. (b)) and the city attorney's opinion is noticeable as legislative history reflecting on the basis for that enactment. Plaintiffs do not dispute the former point and quote the minutes' statement of the reason for denial at least twice in their brief, which we take as a concession the minutes may be considered on review of the demurrer. In their reply brief, plaintiffs object to the city attorney's opinion on the ground it contains hearsay regarding BSA's policies, but that objection does not reach the facts for which notice is sought: that the city attorney concluded continuing free berths would violate the city's resolution and ordinance and conveyed that opinion to the city manager and council. In the absence of a sound objection, we take notice of the opinion as well as the minutes.

Plaintiffs allege the exclusion of the Sea Scouts from the free berth program violated their rights of free speech and association and constituted a denial of due process and equal protection of the laws. These deprivations of constitutional rights are claimed to be violations of state and federal civil rights laws, including Civil Code sections 51, 52, and 52.1, and title 42 United States Code section 1983. Plaintiffs seek damages reflecting the value of berths they were unable to afford to continue using, the rental they have paid and will pay for the berth they still use, emotional distress, and consequential losses. The complaint does not pray for injunctive or declaratory relief.

The trial court sustained Berkeley's demurrer to the amended complaint without leave to amend. The Court of Appeal affirmed, reasoning that plaintiffs had merely been denied a city subsidy "because they declined to adhere to Berkeley's nondiscrimination policy." Berkeley had not "attempted to muzzle anyone's speech" or force the Sea Scouts to sever their association with BSA, but had only "conditioned a city subsidy on compliance with nondiscrimination principles."

We granted plaintiffs' petition for review.

### Discussion

Plaintiffs contend Berkeley violated their rights of free association, speech, and equal treatment under the law by punishing them for being part of BSA despite their having never violated Berkeley's antidiscrimination laws and having "solemnly promised" not to do so in the future. The Court of Appeal, plaintiffs argue, erred in holding Berkeley had properly conditioned the subsidy on compliance with nondiscrimination laws because plaintiffs "have *agreed to comply.*" The lower court and Berkeley, plaintiffs maintain, "*are refusing to take . . . yes for an answer.*"

Berkeley, in contrast, argues that it may place nondiscrimination conditions on government funding without violating rights of speech and association, and insists it properly denied continued free berthing solely because the Sea Scouts were unable to provide adequate assurances of future nondiscrimination, assurances Berkeley reasonably demanded in light of the known policies of BSA, of which the Sea Scouts are a part.

We agree with Berkeley and the Court of Appeal that a government entity may constitutionally require a recipient of funding or subsidy to provide written, unambiguous assurances of compliance with a generally applicable nondiscrimination policy. We further agree Berkeley reasonably concluded the Sea Scouts did not and could not provide satisfactory assurances because of their required adherence to BSA's discriminatory policies.

I. *Berkeley Could Constitutionally Demand Sufficient Guarantees of Nondiscrimination*

Berkeley's requirement that an individual or group receiving a city subsidy in the form of free berths in the Berkeley Marina agree in advance to administer its program without invidious discrimination did not infringe on plaintiffs' speech or associational rights. In order to meet the city's mandate of nondiscriminatory participation policies, the Sea Scouts were required neither to espouse nor to denounce any particular viewpoint nor to form or break any association or affiliation, but only to assure Berkeley of their adherence to the city's policies in connection with subsidized use of Berkeley's facilities.

Under the decisions of the United States Supreme Court, that Berkeley's nondiscrimination requirement applied only to programs assisted by a city subsidy, in the form of free berths at the marina, is virtually dispositive. The high court has generally approved, against First Amendment challenges, programs of governmental financial assistance that limit the expressive activities for which the funds may be used.

In the leading case of *Rust v. Sullivan* (1991) 500 U.S. 173 [114 L.Ed.2d 233, 111 S.Ct. 1759], the court rejected a First Amendment challenge to regulations prohibiting abortion counseling in programs supported by federal family planning funds. "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other. '[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right.' [Citations.]" (*Id.* at p. 193.)

In restricting the range of counseling and advocacy in which programs receiving federal funding could engage, the government had not denied the grantees the right to engage in abortion-related activities. "Congress has merely refused to fund such activities out of the public fisc . . . ." (*Rust v. Sullivan, supra,* 500 U.S. at p. 198; accord, *United States v. American Library Assn., Inc.* (2003) 539 U.S. 194, 212 [156 L.Ed.2d 221, 123 S.Ct. 2297] (plur. opn. of Rehnquist, C. J.) [statutory requirement that libraries receiving aid for Internet access use filtering software "does not 'penalize' libraries that choose not to install such software, or deny them the right to provide their patrons with unfiltered Internet access. [The statute] simply reflects Congress' decision not to subsidize their doing so. To the extent that libraries wish to offer unfiltered access, they are free to do so without federal assistance"]; *Regan v. Taxation*

*With Representation of Wash.* (1983) 461 U.S. 540, 549 [76 L.Ed.2d 129, 103 S.Ct. 1997] [denial of full tax-exempt status to an organization that engages in substantial lobbying activities does not infringe on freedom of speech: "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny"]; cf. *Locke v. Davey* (2004) 540 U.S. 712, 721 [158 L.Ed.2d 1, 124 S.Ct. 1307] [scholarship program's exclusion of theology students does not violate First Amendment's free exercise clause; provision of assistance to those pursuing secular education does not constitute a " 'baseline' " against which denial of assistance to theology students must be deemed a burden on religion].)

The Supreme Court has applied these principles, in particular, to uphold, against First Amendment challenges, government rules limiting financial assistance to those organizations that agree in advance not to practice invidious discrimination in government-assisted programs. *Grove City College v. Bell* (1984) 465 U.S. 555 [79 L.Ed.2d 516, 104 S.Ct. 1211] (*Grove City*) is the closest case on point. A federal statute required recipients of federal education funds to agree not to discriminate on the basis of sex in any program so funded. When the plaintiff college declined to provide an "Assurance of Compliance" with the statute, the federal Department of Education terminated a program of tuition assistance to the college and its students. (*Id.* at pp. 557–561.)

The *Grove City* plaintiffs attacked the statutory condition as, inter alia, a violation of their First Amendment rights, but the high court found the constitutional claim "warrants only brief consideration. Congress is free to attach reasonable and unambiguous conditions to federal financial assistance that educational institutions are not obligated to accept. *E.g., Pennhurst State School and Hospital* v. *Halderman*, 451 U.S. 1, 17 [67 L.Ed.2d 694, 101 S.Ct. 1531] (1981). Grove City may terminate its participation in the [tuition aid] program and thus avoid the requirements of [the nondiscrimination provision]. Students affected by the Department's action may either take their [tuition aid] elsewhere or attend Grove City without federal financial assistance. *Requiring Grove City to comply with Title IX's prohibition of discrimination as a condition for its continued eligibility to participate in the [tuition aid] program infringes no First Amendment rights of the College or its students.*" (*Grove City, supra,* 465 U.S. at pp. 575–576, italics added; see also *Bob Jones University v. United States* (1983) 461 U.S. 574, 602–604 [76 L.Ed.2d 157, 103 S.Ct. 2017] (*Bob Jones*) [restrictive condition on charitable tax status, requiring lack of racial discrimination, did not infringe university's First Amendment right to freedom of religion because the compelling interest in preventing racial discrimination in education justified the policy's limited impact on exercise of religion: "Denial of tax benefits will inevitably have a

substantial impact on the operation of private religious schools, but will not prevent those schools from observing their religious tenets"].)[6]

Similarly, Berkeley, in conditioning free berths on a group's adoption of a nondiscriminatory membership policy, has not prohibited or penalized plaintiffs' exercise of speech or associational rights. In adopting Resolution 58,859 and applying it to end free berths for the Sea Scouts, the city did not purport to prohibit the scouts from operating in a discriminatory manner; it simply "refused to fund such activities out of the public fisc . . . ." (*Rust v. Sullivan, supra,* 500 U.S. at p. 198.) To the extent the Sea Scouts objected to compliance with Resolution 58,859, the organization (to paraphrase *Grove City, supra,* 465 U.S. at p. 575) was free to terminate its participation in the free berth program and thus avoid the requirements of the nondiscrimination provision; "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right" (*Regan v. Taxation With Representation of Wash., supra,* 461 U.S. at p. 549).

The Supreme Court has recognized two exceptions to its broad rule that the government's refusal to subsidize exercise of a First Amendment right does not infringe that right. Neither is applicable here.

■ First, a funding restriction that has as its purpose the suppression of a disfavored viewpoint—especially, but not only, where the government program at issue exists to create or foster a public forum—is subject to strict scrutiny. Invalidating a rule precluding federally funded legal services affiliates from challenging welfare laws, the Supreme Court explained: "Where private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest." (*Legal Services Corp. v. Velazquez* (2001) 531 U.S. 533, 548–549 [149 L.Ed.2d 63, 121 S.Ct. 1043]; see also *Rosenberger v. Rector and Visitors of Univ. of Va.* (1995) 515 U.S. 819, 832–834 [132 L.Ed.2d 700, 115 S.Ct. 2510] [exclusion of journals promoting a particular set of religious viewpoints from program of financial assistance to student newspapers infringed student group's freedom of speech]; *Regan v. Taxation With Representation of Wash., supra,* 461 U.S. at p. 548 [refusal to subsidize lobbying would not come within the rule of permissibility "if Congress were

---

[6] Plaintiffs argue *Grove City* and *Bob Jones* govern only where eliminating a particular type of discrimination has been recognized as a "compelling national interest." The high court in *Grove City,* however, relied on no such compelling-interest analysis, holding simply that the government could attach "reasonable and unambiguous conditions" to financial assistance it offered private institutions. (*Grove City, supra,* 465 U.S. at p. 575.) The court did, in *Bob Jones, supra,* 461 U.S. at page 603, apply the compelling-interest test for free exercise claims, but it later held, in *Employment Div., Ore. Dept. of Human Res. v. Smith* (1990) 494 U.S. 872, 885 [108 L.Ed.2d 876, 110 S.Ct. 1595], that such a justification was not required for neutral laws of general applicability.

to discriminate invidiously in its subsidies in such a way as to ' "ai[m] at the suppression of dangerous ideas" ' "]; *Perry v. Sindermann* (1972) 408 U.S. 593, 595, 598 [33 L.Ed.2d 570, 92 S.Ct. 2694] [college teacher's allegation that the administration's decision not to rehire him was based on his public criticism of its policies presented "a bona fide constitutional claim"]; *Speiser v. Randall* (1958) 357 U.S. 513, 518 [2 L.Ed.2d 1460, 78 S.Ct. 1332] ["denial of a tax exemption for engaging in certain speech" infringes freedom of speech because it is " 'frankly aimed at the suppression of dangerous ideas' "].)[7]

The exception for attempted suppression of a disfavored viewpoint is inapposite to the condition imposed here. In terminating the Sea Scouts' free berths because of the group's failure fully and unambiguously to promise future nondiscrimination, Berkeley did not demand adherence to or renunciation of any idea or viewpoint. A government that requires aid recipients to conform their actions to its laws does not thereby enforce adherence to the philosophy or values behind those laws. More specifically, to state, in applying for government funding, that one will not use the funding for a discriminatory program is not necessarily to state that one agrees with the government's nondiscrimination objective. Thus Berkeley, in requiring assurances that its subsidy and property will be used without discrimination on the basis of religion or sexual orientation, does not demand adherence to the *viewpoint* that motivated the nondiscrimination provision. (See *Boy Scouts of America v. Wyman* (2d Cir. 2003) 335 F.3d 80, 94 [exclusion of BSA from state's workplace charitable contribution campaign because of its discriminatory policies was viewpoint neutral in that nondiscrimination rule's purpose was "to protect persons from the . . . economic and social harms of discrimination" rather than "to impose a price on the expression of [BSA's] point of view"]; but see *Boy Scouts of America, South Florida v. Till* (S.D.Fla. 2001) 136 F.Supp.2d 1295, 1308 [exclusion of local council from off-hours use of public schools because of its adherence to BSA's discriminatory policy characterized as punishment of council for its "message"].)

■ Second, a restriction is suspect to the extent it goes beyond limiting the government funded expressive activity of the recipient and attempts further to limit expressive activities that are *not* government funded. In *Rust v. Sullivan, supra,* 500 U.S. at pages 196–197, the high court explained that funding restrictions previously held to constitute unconstitutional conditions had involved "a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from

---

[7] The restriction on speech of family planning grant recipients in *Rust v. Sullivan, supra,* 500 U.S. 173, might appear to fall logically within this exception, but the high court has since characterized the program in *Rust* as involving government promulgation of its own message, an enterprise in which the government enjoys even greater leeway than in the funding of private speech. (*Legal Services Corp. v. Velazquez, supra,* 531 U.S. at p. 541.)

engaging in the protected conduct outside the scope of the federally funded program," but that a recipient of family planning funds could, despite the restrictions at issue, "continue to . . . engage in abortion advocacy . . . through programs that are separate and independent from" the federally assisted project. (See also *FCC v. League of Women Voters of California* (1984) 468 U.S. 364, 400 [82 L.Ed.2d 278, 104 S.Ct. 3106] [invalidating rule precluding public broadcasting stations from editorializing, in part because under the rule a station that received only a small amount of its income from federal grants was "barred absolutely from all editorializing. . . . The station has no way of limiting the use of its federal funds to all noneditorializing activities, and, more importantly, it is barred from using even wholly private funds to finance its editorial activity"]; Sullivan, *Unconstitutional Conditions* (1989) 102 Harv. L.Rev. 1413, 1463–1467 [discussing "germaneness" as a limitation on government funding conditions].)

This exception, too, is inapplicable. Berkeley, in conditioning its free berths on the Sea Scouts' agreement not to engage in invidious discrimination, did not purport to control the exercise of speech or associational rights by the Sea Scouts or individual plaintiffs *outside* the Berkeley Marina program. Even were the nondiscrimination assurance demanded by Berkeley regarded as a conditional burden on speech or association, its scope would be limited to the very program subsidized by the city. As in *Rust v. Sullivan, supra,* 500 U.S. 173, and *Regan v. Taxation With Representation of Wash., supra,* 461 U.S. 540, plaintiffs here would be free to exercise their expressive or associational rights fully in any program not funded by public money. Federal high court precedent thus fails to support plaintiffs' constitutional claims.

Plaintiffs also contend that by conditioning free berths on adequate assurance of nondiscrimination, Berkeley has established an unconstitutional condition under the decisions of this court. We disagree.

In *Danskin v. San Diego Unified Sch. Dist.* (1946) 28 Cal.2d 536 [171 P.2d 885], this court held invalid on First Amendment grounds a statutory and regulatory scheme that permitted the use of school facilities for the meetings of private groups but excluded "subversive elements." We explained that while "[t]he state is under no duty to make school buildings available for public meetings" (*id.* at p. 545), having done so it could not constitutionally "demand tickets of admission in the form of convictions and affiliations that it deems acceptable" (*id.* at p. 547). We reiterated this principle in *Bagley v. Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 504 [55 Cal.Rptr. 401, 421 P.2d 409], explaining that "the power of government, federal or state, to withhold benefits from its citizens does not encompass a supposed 'lesser' power to grant such benefits upon an arbitrary deprivation of constitutional

right." At the same time, we emphasized that some such conditions on public benefits were justifiable; we articulated a test of justification focusing on how germane and well-tailored the condition is to the purpose of the legislation establishing the benefit and whether the utility of imposing the condition outweighs the impairment of constitutional rights. (*Id.* at pp. 505–507; see also *Committee to Defend Reproductive Rights v. Myers* (1981) 29 Cal.3d 252, 265–266 [172 Cal.Rptr. 866, 625 P.2d 779].)

To apply these principles governing conditions on public benefits here, we need not decide whether Berkeley had adequate justification for its condition, as the condition—the giving of adequate assurances of nondiscrimination—did not demand or preclude the exercise of any speech or associational right by plaintiffs. Plaintiffs repeatedly disavow, both in their complaint and in their briefs in this court, any desire to discriminate on the basis of sexual orientation or religion. They therefore cannot, and do not, claim that Berkeley, by requiring them to refrain from such discrimination as a condition of the free berths, is restricting their freedom to limit their membership for purposes of expressive association. (Cf. *Boy Scouts of America v. Dale, supra,* 530 U.S. 640; *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.* (1995) 515 U.S. 557 [132 L.Ed.2d 487, 115 S.Ct. 2338].) Indeed, plaintiffs, in their briefing, explain why this is a misconstruction of their claims: "Berkeley suggests that Petitioners challenge the condition as 'forc[ing] inclusion' of homosexuals and atheists in their ranks. Obviously this is not so, because Petitioners do not discriminate."

Berkeley's requirement that the Sea Scouts document a nondiscriminatory membership policy in order to qualify for the free berth program also did not condition receipt of a public benefit on the Sea Scouts' giving up their right to be a part of BSA. In requiring assurances of nondiscrimination, Berkeley did not in any way demand, even as a condition of the free berths, that the Sea Scouts quit BSA. To the extent compliance with the city's requirement would have that effect, it would be by the choice of a third party, BSA. Were BSA, that is, to cut its ties with a local scouting program because the program made assurances of nondiscrimination to a local government, the decision to sever the association would be BSA's, not the government's. We are aware of no authority for the extraordinary proposition that government infringes on associational rights by offering one group a financial benefit that, if accepted, could lead another group to sever its association with the recipient.[8]

Nor, as already discussed, did Berkeley's requirement that free berth recipients have nondiscriminatory membership policies require the Sea

---

[8] In part II of the Discussion, below, we reject plaintiffs' additional argument that Berkeley has infringed their associational rights by *punishing* them for being affiliated with BSA.

Scouts, as a condition of the subsidy, to adopt an antidiscrimination viewpoint or repudiate BSA's discriminatory philosophy (a philosophy the Sea Scouts, in any event, expressly state they do not share). We therefore do not agree with plaintiffs that by conditioning free berths on the Sea Scouts' statement of a local nondiscrimination policy, the city compelled them to "renounce" BSA's positions and to "advocate and disseminate" Berkeley's own philosophy. As already explained, to condition a public benefit on assurances of nondiscrimination is not to compel advocacy of a viewpoint.

The complaint alleges Berkeley attempted to compel the Sea Scouts to subscribe to a "pledge of fealty" or "loyalty oath" according with Berkeley's antidiscrimination values. On analysis, however, these general claims provide no valid grounds for a claim of unconstitutionality. The only *facts* alleged regarding such a coerced statement of viewpoint concern the Waterfront Commission's request for a local policy statement of nondiscrimination. The Sea Scouts, according to the complaint, provided such a statement in their letter of April 8, 1998. This satisfied the Waterfront Commission, which recommended continuation of the free berths, albeit on conditions that the letter be distributed to program participants and that the Sea Scouts initiate a dialogue with the Mount Diablo Council on obtaining a change in the national BSA policy. Had the Berkeley City Council accepted the Waterfront Commission's recommendation and imposed these conditions on continuation of the free berths, plaintiffs might with greater plausibility contend the conditions infringed their freedom of speech. But the city council *rejected* the Waterfront Commission's recommendation, instead accepting the city manager's and city attorney's recommendation that the subsidy be discontinued because the April 8 letter was an insufficient assurance of nondiscrimination. The city council's action mooted any claim that the conditions proposed by the Waterfront Commission were unconstitutional.

## II. *Plaintiffs Have Not Been Punished for Associating with BSA*

Relying on *Healy v. James* (1972) 408 U.S. 169 [33 L.Ed.2d 266, 92 S.Ct. 2338], plaintiffs contend they have been subjected to a judgment of " 'guilt by association' " in that Berkeley had no reason to believe the Sea Scouts themselves " 'pose[d] the threat [of discrimination] feared by the Government,' " but rather assumed they discriminated simply because of their affiliation with BSA. (*Id.* at p. 186.) Berkeley's denial of free berths was arbitrary and unjustified by its nondiscrimination purpose because, plaintiffs contend, it "punishes innocent children, and their adult leaders, who are not engaged in the discrimination that Berkeley claims to be battling." In a related claim, they argue they were denied equal protection of the laws in that they were treated differently from other nonprofit community service organizations using the marina, solely because of their association with BSA. Again, we disagree.

The Sea Scouts are a part of BSA, an organization whose official policy excludes homosexuals and atheists from participation. That Berkeley officials were unaware of any past discrimination by the Sea Scouts does not mean none would occur in the future. To require of a group operating as part of an organization with an official policy of discrimination that it agree in advance not to discriminate in the use of the city's free marina berths is a reasonable and narrowly tailored step to implement the diversity and nondiscrimination provisions of Resolution 58,859. That other groups, which were not part of BSA, were not required to give local policy statements assuring nondiscrimination does not show unequal treatment.

When the city asked the Sea Scouts to document that their local policy differed from BSA's, the Sea Scouts negotiated with BSA over such a policy, but, as their attorney explained to the trial court, "They couldn't say the words 'We do not discriminate on the basis of sexual discrimination [*sic*: orientation],' because the Boy Scouts objected." According to the attorney, BSA told plaintiffs, "You can't say you don't discriminate based on sexual orientation."

At oral argument in this court, plaintiffs, through their attorney, expanded on these concessions. When asked by the court what plaintiffs' course of action would be if an "openly and avowedly gay" person sought to participate in the Sea Scouts program, counsel responded, "If the Boy Scouts forbid it, it wouldn't happen. . . . [I]f the Boy Scouts came down on us, we would have to exclude that person." Asked whether plaintiffs and BSA were "one and the same" with regard to potential discrimination, counsel replied, "Essentially," and explained that while BSA and the Sea Scouts were "different organizations, . . . we are bound by what the Boy Scouts tell us we have to do." We accept these concessions by plaintiffs as establishing, even as against any contrary allegation or implication of the complaint, that the Sea Scouts could not, consistent with the limitations imposed on them by BSA, truthfully state they would not in the future discriminate against openly gay or atheistic participants. (See *DeRose v. Carswell* (1987) 196 Cal.App.3d 1011, 1018–1019 [242 Cal.Rptr. 368] [concessions of the plaintiff's attorney before trial court negate contrary allegations for purposes of demurrer]; cf. *Browne v. Superior Court* (1940) 16 Cal.2d 593, 599 [107 P.2d 1] [the petitioner's concessions at oral argument negate contrary allegations in the habeas corpus petition]; *Sacramento County Deputy Sheriffs' Assn. v. County of Sacramento* (1996) 51 Cal.App.4th 1468, 1474, fn. 6 [59 Cal.Rptr.2d 834] [admissions in the plaintiffs' appellate brief negate statements in declarations for summary judgment purposes].)[9]

---

[9] In light of plaintiffs' concessions that the Sea Scouts could not unequivocally state they would not discriminate against gay and atheistic participants and that they would have to follow BSA's discriminatory policy if the occasion arose, their reliance on *Robb v.*

Because of the restrictions enforced by BSA, the April 8, 1998, letter was ambiguous as to how the Sea Scouts would treat an avowedly gay or atheistic participant. The Sea Scouts' statement that they would obey city law implied they would not discriminate on the basis of sexual orientation or religion, as city law forbade such discrimination. But the subsequent statement that the Sea Scouts recruit without regard to a list of factors including race, sex, and "religious preference," but *not* including sexual orientation or religion as such, implied, to the contrary, that the group would disfavor potential participants who were known to be gay or who "prefer[red]" *no* religion. Finally, the Sea Scouts' statement that they viewed sexual orientation as a "private matter" they do not ask participants to "divulge" strongly implied that they viewed openly or avowedly gay people differently from those who kept their orientation private, and reserved the right to treat them differently, contrary to the nondiscrimination requirement of Resolution 58,859. In the April 8 letter, the Sea Scouts, in effect, reserved the right to discriminate against avowedly gay or atheistic participants.

 *Healy v. James, supra,* 408 U.S. 169, upon which plaintiffs rely, actually supports Berkeley's decision. While the high court there condemned government actions "denying rights and privileges solely because of a citizen's association with an unpopular organization" (*id.* at p. 186), the court went on to explain that the government could legitimately demand assurances that an individual or group would not engage in the same prohibited activities as the larger organization with which the individual or group was associated (*id.* at pp. 191–194). Specifically, the high court held that a local Students for a Democratic Society chapter's "equivocation" regarding the use of violent and disruptive tactics could warrant denying the group official recognition. (*Id.* at p. 191.) Though there was no evidence the local group actually posed a significant threat of disruption to the college (*id.* at pp. 189–190), the court explained, "the benefits of participation in the internal life of the college community may be denied to any group that reserves the right to violate any valid campus rules with which it disagrees" (*id.* at pp. 193–194). The requirement that a student group seeking official recognition "affirm in

---

*Hungerbeeler* (8th Cir. 2004) 370 F.3d 735 is misplaced. In that case, the State of Missouri claimed it had properly excluded a local unit of the Knights of the Ku Klux Klan from the state's Adopt-A-Highway program because of the group's judicially noticed history of violence. (*Id.* at p. 740.) The court of appeals found the state's rationale for exclusion "rings hollow" (*ibid.*) because the judicially noticed history of violence related generally to organizations named Knights of the Ku Klux Klan rather than specifically to the local unit or its organizers (*id.* at p. 741). "The mere fact that an applicant's organizational name includes certain widely-used language that has been used in the past by groups for which judicial notice has been taken of having a history of violence is inadequate to demonstrate that the applicant itself violates the dictates of the regulation." (*Ibid.*) The Sea Scouts, who according to the complaint form a subdivision of BSA, whose statement of local policy was limited by BSA dictates, and who, plaintiffs concede, must follow BSA's discriminatory policy, obviously share more than a coincidence of nomenclature with the national organization.

advance its willingness to adhere to reasonable campus law . . . does not impose an impermissible condition on the students' associational rights." (*Id.* at p. 193; see also *Grove City, supra,* 465 U.S. at p. 575 [requiring "Assurance of Compliance" from college was a "reasonable and unambiguous" condition of federal assistance].)

Similarly, Berkeley did not engage in overbroad or arbitrary regulation in denying a subsidy to a BSA program that refused to state an unambiguous local policy of nondiscrimination, instead pointedly reserving the right to discriminate against openly gay and atheistic participants. Denial of free berths to a program operating under a national organization with an enforced policy of discrimination, a program that was asked to and would not give an unqualified assurance of future nondiscrimination, was not overbroad or unjustified as a means of enforcing Berkeley's policy limiting free berths to nonprofit community service organizations that serve the public diversely and without invidious discrimination.

As explained earlier, a demurrer assumes the truth of the complaint's properly pleaded allegations, but not of mere contentions or assertions contradicted by judicially noticeable facts. (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318; *Joslin v. H.A.S. Ins. Brokerage, supra,* 184 Cal.App.3d at p. 374.) Here, the noticeable and conceded facts contradict the complaint's assertions that Berkeley "decided to punish . . . [the] completely innocent" plaintiffs for their association with BSA despite knowing that plaintiffs had, in the April 8, 1998, letter, "agreed not to discriminate against gays or atheists." The facts, including those in the complaint, those subject to judicial notice, and those conceded by plaintiffs, show the Sea Scouts could not and did not unambiguously promise not to discriminate in the use of the marina facilities. The city council, in receipt of the city attorney's opinion discussing the April 8 letter's ambiguity and the city manager's consequent denial recommendation, denied the continued subsidy because BSA's "discriminatory policies against gays and atheists" made impossible a full and unambiguous assurance the Sea Scouts would not discriminate in the future.

Similarly, plaintiffs' allegation that the city excluded plaintiffs from the free berth program without ever determining that the Sea Scouts themselves "pose[d] the threat" of discrimination and without "evidence that Plaintiffs or any participant in the Berkeley Sea Scouts program was going to unlawfully discriminate against anyone," is contradicted by their own concessions and the noticeable facts. The city asked for full assurances that the program posed no threat of future discrimination, but it did not receive them. In light of BSA's policies, which, as counsel conceded in this court, plaintiffs would have to follow, Berkeley reasonably concluded that the Sea Scouts' representations were inadequate to assure future compliance with the city's nondiscrimination rules. Plaintiffs' claim that Berkeley simply "refuses to take . . . yes

for an answer" is belied by the record, which establishes that the Sea Scouts, because of BSA's enforced policies, could not and did not respond to the city with a simple "yes," but rather with an evasive "maybe."

■ Plaintiffs rely in part on allegations that individual members of the Berkeley City Council and other city officials expressed the intent to punish BSA or the Sea Scouts for BSA's policies.[10] Under some circumstances, where the decision maker's reason or object is itself a contested element of a claim of unconstitutionality, "statements made by members of the decision-making body" are properly considered, together with other types of evidence, in determining the object of the official action. (*Church of Lukumi Babalu Aye, Inc. v. Hialeah* (1993) 508 U.S. 520, 540 [124 L.Ed.2d 472, 113 S.Ct. 2217]; see also *Arlington Heights v. Metropolitan Housing Corp.* (1977) 429 U.S. 252, 267–268 [50 L.Ed.2d 450. 97 S.Ct. 555].) But here there is no dispute the basis for the city council's action was, as the council minutes stated, BSA's "discriminatory policies against gays and atheists," which—as the record shows and plaintiffs' attorney conceded in this court—made it impossible for the Sea Scouts to give a complete and unambiguous guarantee against future discrimination. In light of that undisputed legislative object, allegations suggesting merely that individual council members voted for the action because of their personal hostility to BSA's views do not state a claim for a constitutional violation, for such individual motives do not alter the undisputed grounds upon which the council, as a body, acted. (See *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 572, fn. 5 [21 Cal.Rptr.3d 331, 101 P.3d 140] [" 'Material showing the motive or understanding of an individual legislator, including the bill's author, his or her staff, or other interested persons, is generally not considered. [Citations.] This is because such materials are generally not evidence of the Legislature's *collective* intent' "].)

### CONCLUSION AND DISPOSITION

■ The properly pleaded factual allegations of the first amended complaint, taken as true and read in light of the judicially noticeable facts and plaintiffs' factual concessions, show that Berkeley discontinued the Sea Scouts' berth subsidy because the program was unable, consistent with the

---

[10] Councilmembers Woolley and Worthington allegedly "made clear," around the time of the March 11, 1998, Waterfront Commission meeting, that they intended to take "punitive actions" against the Sea Scouts in an "attempt to overturn [BSA's] national policies." At the May 5, 1998, city council meeting, unnamed Berkeley "officials" allegedly indicated the city should and would deny the Sea Scouts continued benefits in order to discourage BSA from maintaining its disfavored policies and to retaliate for BSA's expulsion of Timothy Curran (the plaintiff in *Curran v. Mount Diablo Council of the Boy Scouts, supra*, 17 Cal.4th 670) pursuant to those policies.

enforced policies of BSA, to provide adequate assurances of future nondiscrimination. Denial of a continued subsidy on this ground did not infringe plaintiffs' associational, speech, or equal protection rights. We therefore affirm the judgment of the Court of Appeal.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.