Filed 2/10/16  P. v. Morrow CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MATTHEW PATRICK MORROW,<br><br>    Defendant and Appellant. | D066813<br><br><br><br>(Super. Ct. No. SCD252626) |


APPEAL from a judgment of the Superior Court of San Diego County, Timothy R. Walsh, Judge.  Affirmed.


Eric A. Dumars, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Daniel Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

Matthew Patrick Morrow pleaded guilty to violating Vehicle Code section 23153, subdivision (a), by knowingly and unlawfully driving a motor vehicle under the influence of alcohol and committing an act forbidden by law which caused great bodily injury to the passenger in the vehicle. He also admitted allegations that this was a second offense (*id.*, § 23540), that he had a blood-alcohol concentration (BAC) in excess of 0.15 percent (*id.*, § 23578) and that he personally inflicted great bodily harm on another (Pen. Code, §§ 1192.7, subd. (c)(8), and 12022.7, subd. (a)).

Morrow appeals, contending the court erred in denying his motion to suppress evidence of the results of the testing on the blood drawn from his arm. Morrow's arguments are without merit, and we accordingly affirm the judgment.

I.

FACTUAL AND PROCEDURAL BACKGROUND[1]

A. *Overview*

During the early morning hours of May 5, 2013, a San Diego police officer investigated a single-car collision on Carmel Mountain Road in San Diego. The officer saw a vehicle resting on its passenger side wedged between some trees in an embankment on the side of the road. The officer also saw a directional sign (that had been on a raised island near the center median) and debris laying in the road and tire tracks on the curb leading to where the vehicle was located. Inside the upturned vehicle the police officer

---

[1] Because Morrow's conviction was based on a guilty plea, the facts are taken from the evidence admitted at the March 2014 preliminary hearing and the July 2014 hearing on Morrow's motion to suppress evidence.

found Morrow in the driver's seat and another person in the front passenger seat. At this point, the officer's primary concern was getting medical care for the two people, and they were taken to a hospital in La Jolla for evaluation.

A different San Diego police officer, Linda Tousley, went to the hospital and interviewed Morrow. Tousley asked Morrow if he was willing to let her take a blood sample, and he held out his right arm and said, " 'Sure.' "[2] The test results indicated that Morrow had a BAC of 0.29 percent.

In April 2014, the People charged Morrow in a two-count information with special allegations as a result of the May 2013 collision and Morrow's BAC. Pursuant to Penal Code section 1538.5,[3] Morrow filed a motion to suppress the evidence of the blood draw and the resulting testing of his blood. The People filed a written opposition, and the court held an evidentiary hearing in July 2014. After receiving evidence and considering the argument of counsel, the court denied the motion to suppress. In pertinent part the court found that Morrow consented to the blood draw, and the court concluded that the warrantless search and seizure were not unreasonable.

---

[2]   In discussing Morrow's motion to suppress evidence at part I.B., *post*, we will present more detailed facts of the events between the officer's arrival at the hospital and Morrow's blood draw.

[3]   "A defendant may move . . . to suppress as evidence any tangible or intangible thing obtained as a result of a search or seizure on . . . the following ground[]:  [¶] (A) The search or seizure without a warrant was unreasonable."  (Pen. Code, § 1538.5, subd. (a)(1)(A).)

Morrow pleaded guilty to one count of violating Vehicle Code section 23153, subdivision (a), and certain enhancements. The trial court sentenced Morrow to the upper term of three years in prison and suspended the sentence for five years, during which time he was to be on probation and spend 365 days in the custody of the County Sheriff, along with other terms and conditions. Morrow timely appealed.

B.     *The Hearing on Morrow's Motion to Suppress Evidence*

At the hearing on Morrow's motion, Tousley and Morrow testified, and the parties stipulated to the admission into evidence of certain of Morrow's medical records and a BAC of 0.29 percent for the blood drawn from Morrow at the hospital on the morning of May 5, 2013.

Morrow's testimony was brief: He did not remember being admitted to the hospital, talking with Tousley — including specifically ever giving consent — or having his blood drawn. Thus, all of the evidence on which the trial court's finding of consent was based came from Tousley.

In May of 2013, Tousley was a 14-year veteran of the San Diego Police Department. She had received special training in investigating and evaluating cases involving drivers suspected of driving under the influence of alcohol (DUI) and had been involved in more than 50 DUI investigations.

At approximately 3:25 a.m. on May 5, 2013, Tousley was dispatched to a hospital in La Jolla. She had been told there had been a possible felony DUI collision, and she had been asked to conduct an evaluation to determine whether alcohol was involved and

4

the extent of the injuries;[4] she knew only that the single-car crash had occurred about 30 minutes earlier, and the driver and passenger were being transported to the hospital. By the time she arrived at the hospital, Tousley had learned the identities of Morrow and his passenger and the paramedic unit that was transporting each to the hospital.

When she arrived at the hospital, Tousley first spoke with the paramedics who had transported the injured parties; she learned that Morrow possibly had a dislocated hip. Prior to speaking with him, Tousley observed Morrow, noting that his face was reddish and droopy. Due to his injuries, Tousley could not then speak with Morrow, because the medical staff had begun treating him. After being informed of the nature of Morrow's injuries, Tousley concluded that she could not administer a field sobriety test or use a machine that could determine Morrow's BAC from his breath. Tousley's watch commander then contacted a phlebotomist to respond to Tousley's need at the hospital.

By the time Tousley first spoke with Morrow — which was approximately an hour after she arrived — his hip had been put back into place, and he was in a bed with an intravenous line in his left arm and a monitor attached to one of his fingers. During the procedure to relocate his hip, Morrow had been " 'adequate[ly] sedat[ed]' " with the drug Propofol.[5] Tousley asked Morrow a series of questions, which she described as

---

[4]     Depending on the injuries, the traffic officer investigating the collision could determine whether the potential crime was a felony or a misdemeanor.

[5]     The parties do not cite us to, and we have not independently been able to locate, any evidence in the record regarding the effects of Propofol on a person like Morrow. Although Morrow's attorney argued its effect to the trial court and refers us to an Internet Web site regarding drugs, we do not consider these contentions, since the argument of

"standard" when the interview is part of a DUI evaluation.  Morrow seemed to understand the questions, responding appropriately to what was asked.  He neither said anything that did not make sense nor indicated a lack of comprehension.  Consistently, none of the other police officers or medical personnel who were present suggested that Morrow did not (or might not) understand what was happening.  During this process, Tousley observed that Morrow had red, bloodshot, watery eyes, his speech was slurred, his face was reddish and droopy, and he smelled of alcohol.

After answering the standard interview questions, Morrow provided Tousley with a detailed description of the events of the evening — from 10:30 p.m. when he left work through the time of the collision, which was approximately five hours later.  Morrow acknowledged having four beers with specifically identified friends at a specifically identified location, while also providing a thorough non-DUI explanation for the collision.  Specifically, he described the vehicle's mechanical problems, naming which parts were not working properly and how that adversely affected his ability to steer; he explained that he had to turn suddenly because another car had passed him on the right at a speed in excess of 60 miles per hour, swerved into his lane and braked in front of him; he recalled that his vehicle "flew off" the road and rolled onto its side; and he confirmed that he did not lose consciousness, unbuckling his seatbelt and climbing out on his own.

---

counsel is not evidence.  (*Fuller v. Tucker* (2000) 84 Cal.App.4th 1163, 1173.)  Likewise, we do not consider counsel's arguments — both in the trial court and on appeal — regarding the use or potential effects of the drug Dilaudid on Morrow.  (*Ibid.*)

At that point, Tousley explained to Morrow that, in situations like his where police have reason to believe alcohol may have been a cause of a traffic collision, the police collect a sample of the driver's breath or blood. She further explained that, although the breath machine was not available, there was a phlebotomist who could take a blood sample, and she asked whether he would be willing to have his blood drawn. Morrow responded by extending his right arm (the arm without the intravenous connection) and saying, " 'Sure.' " At that time, Tousley believed Morrow "had the wherewithal to give a valid consent."

The phlebotomist took Morrow's blood, and following analysis the report disclosed that at 4:57 a.m. Morrow had a BAC of 0.29 percent.

The written report that Tousley prepared at or around the date of the incident in May 2013 did not contain a narrative of Morrow's consent. At the district attorney's request, in February 2014 Tousley prepared a supplemental report detailing the events at the hospital on the morning of May 5, 2013.

At the suppression hearing in July 2014, Tousley confirmed that, at the time, she believed Morrrow had consented to the blood draw; in her almost 15 years' experience conducting these evaluations only two drivers had refused to give consent and Morrow was not one of them. In addition, Tousley had independent recollection of the details of the May 2013 evaluation, because Morrow's evaluation was the first one Tousley had performed at a hospital by herself.

After receiving evidence and considering the argument of counsel, the trial court denied Morrow's motion. The court found that Morrow freely and voluntarily consented

7

to the blood draw, expressly ruling that Tousley was credible and that Morrow had an obvious bias. In finding consent, the court focused on that portion of Tousley's testimony in which (1) Morrow had the ability to recall the details of the approximately five hours between the time he left work at 10:30 p.m. and the collision at around 3:30 a.m. the next morning (i.e., May 5, 2013), and (2) Morrow extended his free arm in response to Tousley's question whether he was willing to give blood.

## II.

## DISCUSSION

On appeal, Morrow argues that the blood draw was constitutionally impermissible — i.e., that his consent was not free and voluntary — given that he had been sedated, that Tousley did not give him a choice, and that the police had ample time to obtain a warrant. We disagree.

In reviewing the trial court's ruling on a motion to suppress evidence, we defer to that court's factual findings, express or implied, if supported by substantial evidence. (*People v. Weaver* (2001) 26 Cal.4th 876, 924 (*Weaver*); *People v. Tully* (2012) 54 Cal.4th 952, 979 ["reviewing court 'must accept the trial court's resolution of disputed facts and its assessment of credibility' "].) All presumptions favor the trial court's exercise of its power to judge the credibility of witnesses, resolve conflicts in the testimony, weigh the evidence and draw factual inferences. (*Weaver*, at p. 924.) Under the substantial evidence test, we review the whole record in the light most favorable to the order denying suppression (*People v. Jenkins* (2000) 22 Cal.4th 900, 969) to determine whether it discloses "evidence ' "reasonable in nature, credible, and of solid

8

value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case" ' " (*People v. Samuel* (1981) 29 Cal.3d 489, 505). However, we exercise our independent judgment when determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment. (*Weaver*, at p. 924; *Jenkins*, at p. 969.) Substantively, we review challenges to the admissibility of evidence obtained by police searches and seizures under federal constitutional standards. (*People v. Ayala* (2000) 23 Cal.4th 225, 254-255; *People v. Harris* (2015) 234 Cal.App.4th 671, 681-682 (*Harris*).)

A warrantless search of the person, which includes drawing blood, is constitutionally permissible only if it falls within a recognized exception to the Fourth Amendment's protection that people be secure against unreasonable searches and seizures. (*Missouri v. McNeely* (2013) 569 U.S. __ [185 L.Ed.2d 696, 704, 133 S.Ct. 1552, 1558].) As applicable here, *consent* is " 'one of the specifically established exceptions' " to the Fourth Amendment's warrant requirement. (*People v. Woods* (1999) 21 Cal.4th 668, 674, quoting from *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 219 (*Schneckloth*); see *Fernandez v. California* (2014) 571 U.S. __ [188 L.Ed.2d 25, 38, 134 S.Ct. 1126, 1137] ["A warrantless consent search is reasonable and thus consistent with the Fourth Amendment irrespective of the availability of a warrant."]; *Harris*, *supra*, 234 Cal.App.4th at p. 697 ["actual consent to a chemical test is a valid exception to the warrant requirement"; blood draw].) "The voluntariness of consent is a question of fact to be determined from the totality of circumstances." (*People v. Boyer* (2006) 38 Cal.4th

412, 445; accord, *Schneckloth*, at p. 227; *Harris*, at p. 690.) We review the finding of consent for substantial evidence. (*Weaver*, *supra*, 26 Cal.4th at p. 924.)

The detailed evidence set forth at part I.B., *ante*, substantiates that Morrow freely and voluntarily consented to the blood draw. In summary, when Tousley first spoke with Morrow, she asked him a series of standard questions, which he seemed to understand, and responded appropriately. There was no evidence that anyone involved, including police officers and medical personnel, believed Morrow did not (or might not) understand what was happening. Morrow never said anything that did not make sense or indicated a lack of comprehension. Morrow was able to describe in detail the events of the evening — from 10:30 p.m. when he left work through the time of the collision approximately five hours later. After Tousley explained to Morrow that in situations like his the police collect a sample of the driver's breath or blood, that there was no breath machine available and that a phlebotomist was present, she asked Morrow whether he would allow the phlebotomist to take a blood sample. He responded *both* by extending his free right (i.e., he was aware which arm had no intravenous connection) *and* by saying, " 'Sure.' " At that time, Tousley believed Morrow had the ability to give or withhold consent.

On appeal, Morrow argues first that the trial court erred in finding consent, because the court made the *contrary findings* that Morrow was " 'on medication and sedated' "; that Morrow was "in discomfort, moaning and somewhat intoxicated"; and that when Morrow consented "he may have been incapable of reading a contract." However, purportedly contrary interim findings are not a basis on which to reverse an order in which the ultimate findings actually made are supported by substantial evidence.

10

Because " '[a]n order is presumed correct[,] all intendments are indulged in to support it on matters as to which the record is silent, and error must be affirmatively shown' " (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1046), "oral remarks or comments made by a trial court may not be used to attack a subsequently entered order or judgment" (*Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1009; see *Jie v. Liang Tai Knitwear Co.* (2001) 89 Cal.App.4th 654, 667, fn. 9 [trial court's remarks "not embodied in the written findings or judgment . . . may not be used to impeach the findings" actually made]).

Morrow next argues that the setting was inherently coercive, because even if Morrow *ultimately* was able to understand and respond appropriately to Tousley's questions, "[i]t is reasonable to infer he was less capable and alert at the beginning of Officer Tousley's interview when she asked for consent . . . ." In a related contention, Morrow argues that, because the court stated that Morrow might not have been coherent enough to read a contract, the court "impliedly found" that he lacked the ability to freely and voluntarily consent to the blood draw.[6] The problem with Morrow's analysis in these instances is that, in applying the substantial evidence test, we defer to the trial court's

---

[6] Morrow's reliance on Probate Code section 812, which deals with the legal capacity to contract, is misplaced. Morrow has not offered, and we are not aware of, any authority that suggests that, in determining whether a person has freely and voluntarily consented to a search and seizure, we are to consider the person's capacity to *enter into* a contract under section 812 — which includes consideration of the person's "understand[ing] and appreciat[ion]" of the "rights, duties, and responsibilities created by, or affected by the decision," the "probable consequences for the decisionmaker and, where appropriate, the persons affected by the decision," and the "significant risks, benefits, and reasonable alternatives involved in the decision." (*Ibid.*)

11

inferred findings (or, presumably, accept implied findings) *in support of*, *not contrary to*, the court's ruling.  (*Weaver*, *supra*, 26 Cal.4th at p. 924.)

Morrow also contends the trial court's ruling is undermined by the fact that, at the time he gave consent, he had neither received any *Miranda*[7] warnings nor been informed of his right to withhold consent to the search.[8]  However, in *People v. Monterroso* (2004) 34 Cal.4th 743 (*Monterroso*), the Supreme Court rejected these identical arguments, ruling that these issues are just two of the many factors, but not the only ones, for consideration by the trial judge who sees and hears the witnesses and, based thereon, " ' "is best able to pass upon the matter." ' "  (*Id.* at p. 758 [motion to suppress warrantless search of residence];[9] see *Schneckloth*, *supra*, 412 U.S. at p. 227 ["knowledge of the right to refuse consent is one factor to be taken into account, . . . not . . . the *sine qua non* of an effective consent"].)  To the extent Morrow suggests this evidence outweighs the

---

[7]     *Miranda v. Arizona* (1966) 384 U.S. 436.

[8]     Morrow contends that Tousley's failure to advise him that his refusal to consent to the blood draw would result in additional punishment if he is convicted of certain DUI violations (Veh. Code, § 23612, subd. (a)(1)(D)) resulted in the failure to advise Morrow that he had the choice to refuse consent.  Section 23612, subdivision (a)(1)(D) does not require that a person be informed of the option to decline consent, only that the failure to submit to the testing will result in additional penalties upon conviction of certain DUI violations.  In any event, the statute applies *only* after a person is "lawfully arrested" for one of the specifically identified DUI violations (§ 23612, subd. (a)(1)(A)), and Morrow has not directed us to anywhere in the record that indicates he was under arrest at the time he consented to the blood draw.

[9]     In addition to a lack of *Miranda* warnings and advice of his right to withhold consent, the defendant in *Monterroso* was also under arrest and in handcuffs; and the Supreme Court affirmed a finding that his consent was voluntary.  (*Monterroso*, *supra*, 34 Cal.4th at p. 758.)

12

evidence in support of the finding of consent, we may not reweigh it. (*Weaver*, *supra*, 26 Cal.4th at p. 924.)

Under the totality of the circumstances, we conclude that substantial evidence supports the trial court's finding that Morrow freely and voluntarily consented to have his blood drawn.[10] Because the search and seizure were reasonable here, therefore, the trial court did not err in denying Morrow's motion to suppress the BAC evidence from his blood draw.

DISPOSITION

The judgment is affirmed.

IRION, J.

WE CONCUR:


McINTYRE, Acting P. J.


AARON, J.

---

10 Having affirmed on the basis that Morrow consented to the warrantless search and seizure, we need not consider — and we express no opinion on — either Morrow's argument that Tousley reasonably could have obtained a search warrant, or the People's argument that exigent circumstances justified the warrantless search in any event.