75 Cal.Rptr.3d 112 (2008)
161 Cal.App.4th 1204
COMMITTEE FOR GREEN FOOTHILLS, Plaintiff and Appellant,
v.
SANTA CLARA COUNTY BOARD OF SUPERVISORS et al., Defendants and Respondents;
Board of Trustees of the Leland Stanford Junior University et al., Real Parties in Interest and Respondents.
No. H030986.
Court of Appeal of California, Sixth District.
April 10, 2008.
*116 Wittwer & Parkin and William P. Parkin and Jonathan Wittwer, for Plaintiff and Appellant.
Ann Miller Ravel, County Counsel and Lizanne Reynolds, Deputy County Counsel, for Defendants and Respondents.
Bingham McCutchen, Barbara J. Schussman and Julie Jones, Walnut Creek, for Real Parties In Interest.
ELIA, J.
The Committee for Green Foothills, a California nonprofit corporation, (Committee) brought a petition for a writ of mandamus to enforce the California Environmental Quality Act (CEQA) (Pub. Res.Code, § 21000 et seq.)[1] against the County of Santa Clara (County) and its Board of Supervisors (Board). The litigation arose from the Board's December 13, 2005 resolution approving an agreement to be entered with the Board of Trustees of Leland Stanford Junior University (Stanford)[2] to satisfy Condition I.2 of a General Use Permit approved in 2000(GUP). The condition required Stanford to dedicate easements for, develop and maintain portions of trails, identified as the C1 and S1 trails on the 1995 Santa Clara Countywide Master Plan, that crossed Stanford's lands. The December 2005 resolution selected a final alignment for the S1 trail from among several potential alternative routes, certified the S1 Trail Alignment Environmental Impact Report (EIR) and made CEQA findings for the S1 trail alignment, determined "no further CEQA review is required by the County prior to execution" of the "Agreement for Trail Easements, Construction, Management and Maintenance and Grant of Easements" (trails agreement) with Stanford insofar as the agreement concerned the C1 and C2 trail alignments, and approved the execution of the trails agreement. Among other things, the trails agreement authorized portions of the C1 trail to be developed outside Santa Clara County in San Mateo County and the Town of Portola Valley instead of within the County, provided those other jurisdictions cooperated, and declared that the agreement's execution satisfied GUP Condition I.2.
The Committee makes no claim of wrongdoing with respect to the SI trail. The gravamen of the Committee's claims is that the Board's resolution approved activities with respect to the C1 trail without the requisite CEQA environmental review and that environmental review was improperly deferred and left to other jurisdictions even though the Board's approval committed the County to a definite course of action that conflicted with GUP Condition I.2 requiring the development of a C1 trail within the County.
Respondents successfully demurred on statute of limitations grounds. The Committee appeals from the judgment of dismissal entered following the superior court's order. The principal issue before the trial court was whether the statute of limitations set forth in either section 21167 or Government Code section 65009, subdivision (c), barred the proceedings. We conclude that the court incorrectly sustained the respondents' demurrer without leave to amend on the ground the proceedings were necessarily time-barred.

A. Demurrer

"It is not the ordinary function of a demurrer to test the truth of the plaintiffs *117 allegations or the accuracy with which he describes the defendant's conduct. A demurrer tests only the legal sufficiency of the pleading. [Citation.]" (Committee On Children's Television, Inc. v. General Foods Corp. (1983) 35 Cal.3d 197, 213, 197 Cal.Rptr. 783, 673 P.2d 660.) "In ruling on a demurrer, a court may consider facts of which it has taken judicial notice. (Code Civ. Proc., § 430.30, subd. (a).)" (StorMedia Inc. v. Superior Court (1999) 20 Cal.4th 449, 456, fn. 9, 84 Cal.Rptr.2d 843, 976 P.2d 214.) A facially sufficient pleading may be defective based upon judicially noticed facts and subject to demurrer. (Evans v. City of Berkeley (2006) 38 Cal.4th 1, 6, 40 Cal.Rptr.3d 205, 129 P.3d 394.)
"`A demurrer based on a statute of limitations will not lie where the action may be, but is not necessarily, barred. [Citation.] In order for the bar of the statute of limitations to be raised by demurrer, the defect must clearly and affirmatively appear on the face of the complaint; it is not enough that the complaint shows that the action may be barred. [Citation.]' [Citation.]" (Geneva Towers Ltd. Partnership v. City and County of San Francisco (2003) 29 Cal.4th 769, 781, 129 Cal.Rptr.2d 107, 60 P.3d 692, italics added.)
A reviewing court examines a pleading de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory. (See McCall v. PacifiCare of Cal., Inc. (2001) 25 Cal.4th 412, 415, 106 Cal.Rptr.2d 271, 21 P.3d 1189.) "In reviewing a judgment of dismissal after a demurrer is sustained without leave to amend, we must assume the truth of all facts properly pleaded by the plaintiffs, as well as those that are judicially noticeable. (Blank v. Kirwan (1985) 39 Cal.3d 311, 318[, 216 Cal.Rptr. 718, 703 P.2d 58])" (Howard Jarvis Taxpayers Assn. v. City of La Habra (2001) 25 Cal.4th 809, 814, 107 Cal.Rptr.2d 369, 23 P.3d 601.) We also accept as true those "facts that may be implied or inferred from those expressly alleged. (Rose v. Royal Ins. Co. (1991) 2 Cal.App.4th 709, 716[, 3 Cal.Rptr.2d 483])" (Marshall v. Gibson, Dunn & Crutcher (1995) 37 Cal. App.4th 1397, 1403, 44 Cal.Rptr.2d 339.)
"[W]hen [a demurrer] is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" (Blank v. Kirwan (1985) 39 Cal.3d 311, 318, 216 Cal.Rptr. 718, 703 P.2d 58.) "In assessing whether plaintiffs should be allowed leave to amend, we determine de novo whether the complaint states facts sufficient to state a cause of action under any possible legal theory. [Citation.] We are not limited to plaintiffs' theory of recovery or `form of action' pled in testing the sufficiency of the complaint. (Barquis v. Merchants Collection Assn. (1972) 7 Cal.3d 94, 103[, 101 Cal.Rptr. 745, 496 P.2d 817])" (City of Dinuba v. County of Tulare (2007) 41 Cal.4th 859, 870, 62 Cal.Rptr.3d 614, 161 P.3d 1168.)

B. Procedural History and Background

On June 9, 2006, the Committee filed a petition for writ of mandamus challenging the approval of the changes to the C1 trail alignment on the ground the approval violated CEQA because no environmental review had been conducted prior to the decision. It sought to compel respondents to set aside the portion of the Board's December 13, 2005 resolution that "deems Stanford to have complied with GUP condition 1.2 and allows the relocation of the C1 Trail Alignment to a location generally *118 on the west side of San Francisquito Creek in the County of San Mateo and the Town of Portola Valley...." It also sought injunctive relief precluding respondents "from engaging in any activity pursuant to the approval of the C1 Trail Alignment ... in the above described Resolution, until the environmental review complies with CEQA and the C1 Trail Alignment complies with CEQA."
Respondents and the real parties in interest demurred to the petition on the ground that it failed to state facts sufficient to constitute a cause of action. (Code Civ. Proc., § 430.10, subd. (e)) in that it was time barred under section 21167, subdivision (c), (action alleging that an EIR does not comply with CEQA must be commenced within 30 days of filing the notice of determination) and California Code of Regulations, title 14, section 15112, subdivision (c)(1). They successfully asked the court to take judicial notice of the Board's December 13, 2005 resolution, the December 15, 2005 Notice of Determination, and revised December 20,' 2005 Notice of Determination.
In the preamble to the resolution, the Board made the following factual statements. Stanford University "applied for a Community Plan and General Use Permit (`GUP') to allow development of an additional 2,035,000 square feet of non-residential academic development and 3,018 housing units at Stanford, which the Board of Supervisors approved on December 12, 2000." "GUP condition I.2 requires Stanford to `dedicate easements for, develop, and maintain the portions of two trail alignments which cross Stanford lands shown in the 1995 Santa Clara Countywide Trails Master Plan (Routes S1 and C1).'" "[D]ue to complexities with the C1 alignment, including but not limited to a lawsuit between the County of San Mateo and property owners along a portion of the Alpine Road right-of-way within or near the C1 alignment, in 2001 the Board ... directed County staff and Stanford to suspend work on the C1 alignment and to proceed with the S1 alignment to avoid any further delay in implementing the S1 alignment." A supplemental EIR for the SI trail alignment "assesse[d] the project-specific environmental consequences of constructing one of the two trails that Stanford is required to dedicate as a result of a mitigation measure identified in the GUP EIR" and "analyze[d] the environmental effects of three potential primary S1 trail alignments, which are identified as S1-A, S1-C, and S1-D, and several alternative segments within the primary alignments ...."
As to the C1 trail route, the resolution's preamble stated: "Stanford has completed the portions of the C1 alignment that are within Santa Clara County." "[B]ecause the remaining portions of the C1 alignment lie within the jurisdiction of San Mateo County and the Town of Portola Valley, necessitating their ... cooperation, Stanford has agreed to provide funding to San Mateo County ($8.4 million) and Portola Valley ($2.8 million) for trail construction and environmental compliance and to dedicate to those jurisdictions any easements that are needed for the trail across Stanford land."
In the portion of the resolution addressing CEQA compliance, the environmental review process to date was described. The resolution recognized that the GUP EIR had identified a significant environmental impact resulting from Stanford's development, which would reduce availability of recreational facilities but increase demand. It stated that a mitigation measure identified in the GUP EIR required Stanford to dedicate trail easements shown on the County Trails Master Plan in order to provide more recreational opportunities. *119 It also referred to GUP Condition I.2, which required Stanford to "dedicate easements for, [and] develop and maintain the portions of the two trail alignments which cross Stanford lands shown in the 1995 Santa Clara County Countywide Trails Master Plan (Routes S1 and C1)."
In its resolution, the Board certified the final supplemental EIR "for the actions described in this Resolution and the Final S1 SEIR, i.e. the selection of the Alternative S1-C Alignment (Bicycle Lane along Deer Creek Road) and approval of the Agreement For Trail Easements pertaining to that alignment." The Board made other CEQA findings with respect to the SI alignment. Its resolution stated that "[t]he SI SEIR supplements the GUP EIR and the Santa Clara County Countywide Trails Master Plan Update SEIR, which are both considered program EIRs under CEQA."
In regard to the C1 and C2 trails, the resolution stated: "The Trails Master Plan SEIR is a program EIR that evaluates, at a broad level, the environmental effects of implementing the County's policies for the planning, acquisition, design, operations, and maintenance of Countywide trails and trail facilities.... The Trails Master Plan recognizes a variety of types of trail routes and acknowledges that some routes may extend beyond the borders of Santa Clara County." No reference was made to the GUP EIR or to any supplemental EIR for the C1 trail alignment. The Board did not make any detailed CEQA findings for the C1 trail alignment as it had done for SI alignment in its resolution. The Board did not state that the approved activities with regard to, the C1 trail had been examined in light of the GUP EIR and the Countywide Trails Master Plan EIRs or that any determination had been made that those activities were within the scope of those program EIRs.
The Board then made the following determinations with regard to the C1 and C2 alignments: "With regard to the C1 and C2 trail routes, the County's approval of the Agreement For Trail Easements does not constitute County approval of construction, operation or maintenance of specific trail improvements along those routes. The Agreement for Trail Easements contemplates that, prior to any trail improvements, detailed construction plans will be reviewed and considered by the jurisdictions of San Mateo County, Town of Portola Valley and Town of Los Altos Hills, and that those jurisdictions will have discretion to consider whether and how to improve trail improvements. Accordingly, the Board finds that no further CEQA review is required by the County prior to execution of the Agreement For Trail Easements."
The Board found with respect to Stanford's compliance with GUP Condition I.2: "Based on Stanford's commitments as reflected in the Agreement for Trail Easements, the Board finds Stanford to be in compliance with condition I.2 of the 2000 General Use Permit." The Board delegated to the Director of the County Parks and Recreation Department "the authority to take all further actions by the County that are necessary or appropriate to approve and fully implement the S1, C1 and C2 trail alignments in accordance with the Agreement for Trail Easements, following approval by County Counsel as to form and legality and approval by the Office of the County Executive."
An unsigned copy of the trails agreement was attached as Exhibit 1 to the Board's resolution. The agreement to be executed recited: "Condition I.2 of the GUP (`condition I.2') implements the Community Plan and the Trails Master Plan and provides: Stanford shall dedicate easements for, develop, and maintain the *120 portions of the two trail alignments which cross Stanford lands shown in the Trails Master Plan (Routes S1 and C1), according to the following timeline: [¶] a. In consultation with the County Parks and Recreation Department, Stanford shall identify trail easements and complete Agreements for Trail Easements within one year of GUP approval. For purposes of this condition, the term `easement' includes any other equally enforceable mechanism acceptable to the County Board of Supervisors. [¶] b. Stanford shall work with the County Parks and Recreation Department to identify responsibilities for trail construction, management and maintenance. An agreement regarding these issues, including but not limited to a time frame for implementation, shall be reached within one year of GUP approval."
The trails agreement further recited that "[t]he parties intend that by entering into this Agreement, Stanford satisfies condition 1.2 of the GUP." The agreement explicitly declared: "Execution of this Agreement satisfies Condition I.2 of the General Use Permit. Stanford shall perform its covenants contained in this Agreement. ..." It also declared: "The S1 and C1 alignments described in this Agreement are consistent with the Trails Master Plan. Stanford has identified trail easements for the portions of these alignments that cross its lands in consultation with the County Parks and Recreation Department."
In regard to implementation of the C1 trail, the trails agreement required Stanford to provide, at no cost, copies of its engineering plans of possible improvements to, and a possible trail alignment of, the C1 trail in the County of San Mateo and the Town of Portola Valley. It further stated that "the alignment shown on the existing plans is only one possible alignment for the C-l Trail" and provided that "Stanford, the County of San Mateo and Town of Portola Valley will jointly determine the final alignment."
In addition to provisions implementing the SI trail alignment, the agreement provided: "Stanford will also fund improvements to the C1 and C2 trails identified in the Trails Master Plan that are located within unincorporated San Mateo County, the Town of Portola Valley, and the Town of Los Altos Hills. Stanford will also dedicate easements for the portions of the C1 alignment that cross its lands in San Mateo County and the Town of Portola Valley." It obligated Stanford to make specified funds available to the County of San Mateo and the Town of Portola Valley. In regard to dedication of trail easements, the agreement provided: "Upon request and contemporaneous with the initial payment to each or at another time acceptable to the other jurisdictions, Stanford shall dedicate to San Mateo and Portola Valley public easements reasonably necessary for the C-l Trail that cross [sic] Stanford's lands, and for the widening and improvement of it according to plans...."
The trails agreement recognized the possibility that other jurisdictions might not enter into agreements to construct trail improvements, a condition precedent to Stanford's obligation to fund improvements by those jurisdictions, or other jurisdictions might not timely complete construction. In those eventualities, Stanford's obligation to fund trail improvements converted to an obligation to pay Santa Clara County in accordance with the agreement. The county was required to use those funds received from Stanford under this substitute provision in some unspecified way to mitigate "the adverse effect on recreational opportunities for existing or new campus residents and facility users that will be caused by the housing and academic development *121 approved by the GUP, which will reduce the availability of recreational facilities while increasing the demand for such facilities," "provided the funds shall not be used for facilities on Stanford's lands without Stanford's consent."
The original Notice of Determination made no mention of the C1 trail alignment. The notice's project description and project location referred to only the S1 trail alignment. The only EIR mentioned in the notice was the EIR for the S1 trail alignment. The notice stated that "[t]he project will not have a significant effect on the environment," an EIR had been prepared for the project, approval of the project was conditioned upon mitigation measures, and "[f]indings were made pursuant to section 15091 of CEQA." The stamp on the Environmental Declaration of the Santa Clara County Clerk-Recorder shows the notice was posted December 16, 2005 through January 15, 2006.
The revised Notice of Determination changed the project description to include the Board's actions with respect to the C1 and C2 trail alignments. It referenced the EIR for the S1 Trail Alignment, the 2000 GUP EIR, and the "Countywide Trails Master Plan EIR/SEIR." The notice's statement of project location specified that the C1 alignment was "located generally on the west side of the creek in San Mateo County and the. Town of Portola Valley, along the Alpine Road from Rural Lane to Arastradero Road (approximately 3 mi)." The notice's statement of project description included: "The County of Santa Clara approved the Agreement for Trail Easements with regard to the C1 and C2 trail routes, but the Agreement does not constitute County approval of construction, operation or maintenance of specific trail improvements along these routes. The Agreement contemplates that, prior to any trail improvements, detailed construction plans will be reviewed and considered by the jurisdictions of San Mateo County, Town of Portola Valley, and Town of Los Altos Hills for their discretion of how to improve the trail improvements." (Italics omitted.) Like the previous notice of determination, it stated that "[t]he project will not have a significant effect on the environment," an EIR had been prepared for the project, "Mitigation Measures have been made a condition of approval of the project," and "[f]indings were made pursuant to section 15091 of CEQA." The stamp on the Environmental Declaration of the Santa Clara County Clerk-Recorder showed the notice was posted "December 20, 2005 through January 19, 2005 [sic]."
The Committee successfully asked the court to take judicial notice of the following: (1) a December 13, 2005 memorandum to the Board from the director of the County's Department of Parks and Recreation; (2) a September 13, 2005 memorandum to the Board from the Planning Office of the County's Department of Planning and Development; (3) a public comment letter and response in the SI Trail Alignment EIR;[3] and (4) the November 1995 Countywide Trails Master Plan map.
The December 2005 memorandum stated that the C1 trail alignment "concept noted in the GUP, and as depicted in the Countywide Trails Master Plan map, is to create a trail near San Francisquito Creek on Stanford's lands in Santa Clara County." *122 (Italics added.) The memorandum described the difficulties encountered in attempting to implement this alignment due to potential environmental impacts to a riparian habitat and Stanford's rejection of an interior alignment. It indicated the current proposal was "to build a new trail, or renovate the existing trail, in a location generally west of San Francisquito Creek in San Mateo. County and the Town of Portola Valley." The memorandum acknowledged that such an alignment would require cooperative agreements with those jurisdictions. As to CEQA compliance, the memorandum indicated that a supplemental EIR for the S1 Trail Alignment had been prepared and recommended that the Board certify it, select the alternative S1-C alignment, and make "related CEQA findings." The memorandum did not indicate any environmental review had been done with regard to the proposed changes to C1 trail alignment but acknowledged that "[t]he details of the C1 alignment must be further analyzed in the CEQA study...."
The September 2005 memorandum made staff recommendations relating to the SI trail alignment to the Board. It indicated that "staff [was] following the Board's direction to ... proceed with S1 and to address C1 at a later date."
The response to the public comment, which complained about locating a trail in San Mateo County, clarified the "C1 route is not within the scope of this SEIR." The countywide trails map shows proposed trail routes within the County and possible points of connection to trail routes in adjacent counties.
The trial court sustained respondents' demurrer with leave to amend.
The Committee filed a new pleading, denominated "first amended petition for writ of mandamus." It alleged: "In December 2000, the County of Santa Clara, by and through its Board of Supervisors, (`Respondents') adopted the Stanford University Plan (CP) and 2000 General Use Permit (`GUP'), and certified the Stanford University CP/GUP Environmental Impact Report (`GUP EIR'). The GUP provided The Leland Stanford Junior University and the Board of Trustees of the Leland Stanford Junior University (`Stanford' or `Real Parties') with entitlements for development of over two million square feet and over 3,000 housing units, subject to implementation of specified environmental mitigation measures and permit conditions of approval. Mitigations and conditions of approval included the dedication of the S1 and C1 Trails as specified in the Santa Clara Countywide Trails Master Plan (`SCC Trails Plan'). This condition was known as GUP Condition I.2. According to the GUP EIR, the mitigation measures were required in order to mitigate environmental impacts associated with Stanford's development because the `CP/GUP will reduce the availability of recreational facilities while increasing the demand for such facilities.' The GUP EIR states that `Stanford shall also dedicate the trail easements shown on the County Trails Master Plan.' GUP Condition I.2 requires that Stanford dedicate, develop and maintain the C1 Trail identified in the SCC Trails Plan."
The amended petition alleged that "the SCC Trails Plan does not call for C1 Trail to be located in San Mateo County and/or Portola Valley" and "the approval of the C1 Trail in San Mateo County and Portola Valley, agencies over which Respondents have no jurisdiction, does not meet GUP Condition I.2." It stated: "In December 2001, Stanford had proposed to satisfy GUP Condition I.2 pertaining to the C1 Trail by constructing a trail in the County of San Mateo first and if agreements could not be made with the involved jurisdictions *123 (County of San Mateo, City of Menlo Park and the Town of Portola Valley), Stanford would commit to providing a trail near the east side of San Francisquito Creek in the County of Santa Clara. No agreement was ever reached between Stanford and the County of San Mateo or the Town of Portola Valley." It alleged that approval of relocating segments of the C1 trail to the County of San Mateo and the Town of Portola Valley without any environmental review violated CEQA. The petition averred "unlike the approval of the S1 Trail, there was no environmental review prepared for the proposed C1 Trail in the County of San Mateo and the Town of Portola Valley."
The amended petition asserted that the Board's approval of the C1 Trail in San Mateo County and the Town of Portola Valley in its December 2005 resolution "is subject to environmental review under CEQA because its approval is a `project' under CEQA." It stated that "the S1 EIR does not review the environmental impacts of the proposed C1 Trail in San Mateo County and the Town of Portola Valley" and the "S1 EIR" explicitly stated: "`The C1 trail route is not within the scope of the SEIR.'" This petition further alleged that the "Board of Supervisors abused its discretion by approving the C1 Trail outside of its jurisdiction without preparing any environmental review."
According to the petition, "[t]he C1 Trail, as provided for in the GUP and as depicted in the SCC Trails Plan, is designed to create a trail near San Francisquito Creek/Los Trancos Creek ... on Stanford's lands in the County of Santa Clara." It stated that "the Agreement does not result in full compliance [with the permit condition] since the Agreement does not result in construction of the C1 Trail designated in the County Master Trails Plan as required by GUP Condition I.2."
In a first cause of action, the Committee sought declaratory relief in the form of a judicial declaration that both notices of determination had "no force and effect or validity" as they relate to the C1 Trail because respondents never "determined whether the proposed C1 Trail may have a significant effect on the environment...." In a second cause of action, the Committee alleged that respondents County and Board had violated CEQA and abused their discretion by failing to "perform environmental review for the approval of the `C1 Trail' in the County of San Mateo and the Town of Portola Valley." The Committee sought a writ of mandamus compelling respondents County and Board to (1) set aside the Board's resolution insofar as it "deems Stanford to have complied with GUP [Condition I.2" and allows construction of the C1 Trail "on the west side of San Francisquito Creek in the County of San Mateo and the Town of Portola Valley" and (2) compelling them to "comply with CEQA." It also sought injunctive relief preventing respondents "from engaging in any activity pursuant to the proposed C1 Trail as approved in the [Board's December 13, 2005] Resolution" until respondents "conduct environmental review and comply with CEQA."
In a third cause of action, the Committee alleged that, among other things, "CEQA and the CEQA Guidelines require that mitigation measures be fully enforceable through permit conditions, agreements and other measures," "Condition 1.2 requires the C1 Trail to be built in accordance with the County Trails Master Plan," and respondents County and Board "have a mandatory duty to require compliance with Condition I.2." The Committee sought a writ of mandamus compelling respondents to enforce GUP Condition I.2.
*124 Respondents filed a demurrer to the first amended petition on the ground it was time barred by section 21167, subdivisions (c) and (e), and by Government Code section 65009, subdivision (c). They argued that the CEQA statute of limitations barred any claim by the Committee that "the County did not comply with CEQA when it adopted the resolution approving the Trails Agreement" and Government Code section 65009, subdivision (c), barred any claim challenging the County's determination that Stanford was in compliance with GUP condition I.2.
The Committee countered that "when an agency fails to make any determinations whether a project will have a significant affect [sic ] on the environment, the statute of limitations is 180 days" under section 21167, subdivision (a). It also contended that its petition for mandamus was simply an action to enforce an approved permit condition that had not been amended and, therefore, the 90 day limitation period under Government Code section 65009, subdivision (c), was inapplicable.
The Committee asked the trial court to take judicial notice of the May 2006 Annual Report No. 5 prepared by the Santa Clara County Planning Office regarding Stanford University's compliance with the conditions of the 2000 General Use Permit. The trial court denied the request.[4] In ruling on the demurrer, however, the trial court took judicial notice of the documents submitted with the prior demurrer but asserted it was taking notice of "the existence and filing of the documents" and "not the truth of the matters stated therein."
The trial court found that the notices of determination "did not lack any of the material information required and were at a minimum in substantial compliance with CEQA Guidelines § 15094...." The court stated that the petition's allegations that "the County failed to conduct environmental review for the C1 Trail are contradicted by the judicially noticed documents and are disregarded." The court also indicated that it would disregard allegations contradicting the statement in the Board's resolution that GUP Condition I.2 had been complied with and, therefore, the Committee could not state facts sufficient to justify relief. It found that the mandamus proceeding to enforce GUP Condition I.2 "most closely resemble[d] a CEQA claim" and was subject to the 30-day limitations period under section 21167, subdivision (e). The trial court sustained the demurrer without leave to amend, finding that all challenges to the County's action were required to be filed within 30 days from the filing of the second notice of determination under section 21167, subdivision (b), (c), or (e), that is no later than January 19, 2006, and the defects could not be cured by amendment.[5]
*125 A judgment of dismissal was entered and the Committee appealed.

C. Statute of Limitations Applicable to Writs of Traditional Mandamus

"It is established in this state that a mandamus proceeding is barred if not commenced within the period prescribed by the limitations statutes and that the limitation begins to run when the right first accrues. [Citations.]" (Barlow v. City Council of City of Inglewood (1948) 32 Cal.2d 688, 697, 197 P.2d 721.) "Rules of law relating to limitations of actions are applicable to mandamus proceedings. [Citation.]" (Ginns v. Savage (1964) 61 Cal.2d 520, 524, 39 Cal.Rptr. 377, 393 P.2d 689.)
"Both mandamus and declaratory judgment are remedies available to en force a variety of obligations; choice of the statute of limitations applicable to these remedies depends on the right or obligation sought to be enforced, and the statute's application generally follows its application to actions for damages or injunction on the same rights and obligations. [Citation.] Thus, a declaratory judgment action or mandate petition to enforce a statutory liability must be brought within the same three-year period after accrual of the cause of action (Code Civ. Proc., § 338, subd. (a)) as an action for damages or injunction on the same liability. (Abbott v. City of Los Angeles (1958) 50 Cal.2d 438, 462-464[, 326 P.2d 484]; Dillon v. Board of Pension Commrs. (1941) 18 Cal.2d 427, 429-430[, 116 P.2d 37])" (Howard Jarvis Taxpayers Ass'n v. City of La Habra, supra, 25 Cal.4th at p. 821, 107 Cal. Rptr.2d 369, 23 P.3d 601.) "It is often *126 difficult to decide which statute of limitations governs an action for writ of mandate. The code provisions authorizing this action are silent as to the time within which it must be filed. (See Code Civ. Proc., § 1085 et seq.) Accordingly, the courts have developed the rule that the question is to be resolved not by the remedy prayed for but by the nature of the underlying right or obligation that the action seeks to enforce. {Allen v. Humboldt County Board of Supervisors (1963) 220 Cal.App.2d 877[, 34 Cal.Rptr. 232])" (Green v. Obledo (1981) 29 Cal.3d 126, 141, fn. 10, 172 Cal.Rptr. 206, 624 P.2d 256.)

D. CEQA's Statute of Limitation

"Section 21167 sets forth the time within which an action challenging a public agency's decision under the provisions of CEQA must be filed." (Sierra Club v. State Bd. of Forestry (1994) 7 Cal.4th 1215, 1230, 32 Cal.Rptr.2d 19, 876 P.2d 505.) The Committee insists that, although a notice of determination was filed, the applicable limitation period is 180 days under subdivision (a) of section 21167 because the Board never determined whether the approved changes regarding the C1 trail alignment may have a significant effect on the environment. Respondents maintain that "the 180-day limitations period is a fallback that applies only when the public agency has not provided official notice of its action" and the limitation period is 30 days whenever a legally sufficient notice of determination is filed, as they claim was done here. Respondents insist that subdivision (e) of section 21167 required the Committee to file suit within 30 days of the notice of determination.
Section 21167 provides in pertinent part: "An action or proceeding to attack, review, set aside, void, or annul the following acts or decisions of a public agency on the grounds of noncompliance with this division shall be commenced as follows: [¶] (a) An action or proceeding alleging that a public agency is carrying out or has approved a project that may have a significant effect on the environment without having determined whether the project may have a significant effect on the environment shall be commenced within 180 days from the date of the public agency's decision to carry out or approve the project, or, if a project is undertaken without a formal decision by the public agency, within 180 days from the date of commencement of the project. [¶] (b) An action or proceeding alleging that a public agency has improperly determined whether a project may have a significant effect on the environment shall be commenced within 30 days from the date of the filing of the notice required by ... subdivision (a) of Section 21152. [¶] (c) An action or proceeding alleging that an environmental impact report does not comply with this division shall be commenced within 30 days from the date of the filing of the notice required by ... subdivision (a) of Section 21152 by the lead agency .... [¶] (e) An action or proceeding alleging that another act or omission of a public agency does not comply with this division shall be commenced within 30 days from the date of the filing of the notice required by ... subdivision (a) of Section 21152."[6] Respondents recognize *127 that section 21167, subdivision (d), which applies to projects determined to be not subject to CEQA, is inapplicable.[7]
Section 21152, subdivision (a), requires a local agency to file a notice of determination after it "approves or determines to carry out a project" subject to CEQA. The notice must "indicate the determination of the local agency whether the project will, or will not, have a significant effect on the environment and shall indicate whether an environmental impact report has been prepared pursuant to this division." (§ 21152, subd. (a).) Where a lead agency "determines that a proposed project, not otherwise exempt from this division, would not have a significant effect on the environment," the agency must "adopt a negative declaration to that effect." (§ 21080, subd. (c).) An EIR must be prepared where "there is substantial evidence, in light of the whole record before the lead agency, that the project may have a significant effect on the environment ...." (§ 21080, subd. (d).)
When we consider CEQA as a whole, it is apparent that a notice of determination is meant to follow a determination of whether a project subject to' CEQA may have a potential environmental effect, which determination is reflected in a negative declaration, a mitigated negative declaration, or an EIR. The CEQA Guidelines[8] support this understanding. "Before granting any approval of a project subject to CEQA, every lead agency or responsible agency shall consider a final EIR or negative declaration or another document authorized by these guidelines to be used in the place of an EIR or negative declaration." (CEQA Guidelines, § 15004, subd. (a).) "`Approval' means the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person." (CEQA Guidelines, § 15352, subd. (a).)[9]
*128 A "notice of determination" is "a brief notice to be filed by a public agency after it approves or determines to carry out a project which is subject to the requirements of CEQA." (CEQA Guidelines, § 15373.) CEQA Guidelines section 15112, subdivision (c)(1), provides that, "[w]here the public agency filed a notice of determination in compliance with Sections 15075 or 15094," the limitations period is "30 days after the filing of the notice and the posting on a list of such notices." CEQA Guideline section 15075 concerns notices of determination applicable to project approvals based upon adoption of a negative declaration or a mitigated negative declaration.[10] CEQA Guideline section 15094 concerns notices of determination applicable to project approvals based upon preparation and certification of an EIR.[11] Whether a project is approved based upon a negative declaration, a mitigated declaration, or an EIR, a notice of determination must contain the agency's *129 determination of whether the project will have a significant effect on the environment (CEQA Guidelines, §§ 15075, subd. (b)(4), 15094, subd. (b)(4)) and contain a statement that either a negative declaration or mitigated negative declaration was adopted (CEQA Guidelines, §§ 15075, subd. (b)(5)) or "[a] statement that an EIR was prepared and certified pursuant to the provisions of CEQA" (CEQA Guidelines, §§ 15094, subd. (b)(5)). Ordinarily, a notice of determination provides constructive notice and "limit[s] the appellate rights of those who seek to challenge the propriety of the governmental action by alleging that the public agency improperly determined the project has no significant effect on the environment." (Citizens of Lake Murray Area Assn. v. City Council (1982) 129 Cal. App.3d 436, 441, 181 Cal.Rptr. 123.)
In this case, the revised notice of determination, of which the trial court took judicial notice, specified a number of EIRs: the Stanford University SI Trail Alignment EIR, the GUP EIR, and the Countywide Trails Master Plan EIR/SEIR. The Board's December 2005 resolution, of which the trial court took judicial notice, identified the GUP EIR and Countywide Trails Master Plan SEIR as program EIRs under CEQA and the S1 Trail Alignment EIR as a supplement to those program EIRs.
The CEQA Guidelines describe different types of EIRs. (CEQA Guidelines, § 15160 et seq.) "The most common type of EIR examines the environmental impacts of a specific development project." (CEQA Guidelines, § 15161.) In contrast, a program EIR "may be prepared on a series of actions that can be characterized as one large project" and are related. (CEQA Guidelines, § 15168, subd. (a).) "Subsequent activities in the program must be examined in light of the program EIR to determine whether an additional environmental document must be prepared." (CEQA Guidelines, § 15168, subd. (c).) "If a later activity would have effects that were not examined in the program EIR, a new initial study would need to be prepared leading either to an EIR or a negative declaration." (CEQA Guidelines, § 15168, subd. (c)(1), italics added.) Contrariwise, "[i]f the agency finds that pursuant to Section 15162, no new effects could occur or no new mitigation measures would be required, the agency can approve the activity as being within the scope of the project covered by the program EIR, and no new environmental document would be required." (CEQA Guidelines, § 15168, subd. (c)(2).)
CEQA Guidelines section 15162 details the conditions requiring a subsequent EIR. If any one of the specified conditions occurs after a project is approved, "a subsequent EIR or negative declaration shall only be prepared by the public agency which grants the next discretionary approval for the project, if any." (CEQA Guidelines, § 15162, subd. (c).) One of those conditions is that substantial evidence shows "[substantial changes are proposed in the project" that will involve "new significant environmental effects or a substantial increase in the severity of previously identified significant effects...." (CEQA Guidelines, § 15162, subd. (a)(1).) Under CEQA, no subsequent or supplemental environmental impact report is required unless one or more of the following events occurs: "(a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report, [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified *130 as complete, becomes available." (§ 21166.)
CEQA Guidelines section 15163 permits preparation of a supplement to an EIR instead of a subsequent EIR if "[a]ny of the conditions described in [CEQA Guidelines] [s]ection 15162 would require the preparation of a subsequent EIR," and "[o]nly minor additions or changes would be necessary to make the previous EIR adequately apply to the project in the changed situation." (CEQA Guidelines, § 15163, subd. (a).) "If a subsequent or supplemental EIR is necessary, ... the state CEQA Guidelines require that the later EIR receive the same circulation and review as the initial EIR. ([CEQA Guidelines], §§ 15162, 15163; see Mira Monte Homeowners Assn. v. County of Ventura (1985) 165 Cal.App.3d 357, 362, fn. 7, 363[, 212 Cal.Rptr. 127]; Sutter Sensible Planning, Inc. v. Board of Supervisors (1981) 122 Cal.App.3d 813, 822[, 176 Cal.Rptr. 342])" (Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn. (1986) 42 Cal.3d 929, 936, 231 Cal.Rptr. 748, 727 P.2d 1029.)
Under CEQA Guidelines section 15164, a lead agency must "prepare an addendum to a previously certified EIR if some changes or additions are necessary but none of the conditions described in [CEQA Guidelines] Section 15162 calling for preparation of a subsequent EIR have occurred." (CEQA Guidelines, § 15164, subd. (a).) "An addendum need not be circulated for public review but can be included in or attached to the final EIR...." (CEQA Guidelines, § 15164, subd. (c).) The addendum must contain a "brief explanation of the decision not to prepare a subsequent EIR pursuant to [CEQA Guidelines] Section 15162" and "[t]he explanation must be supported by substantial evidence." (CEQA Guidelines, § 15164, subd. (e).) The CEQA Guidelines require the "decision-making body" to "consider the addendum with the final EIR ... prior to making a decision on the project." (CEQA Guidelines, § 15164, subd. (d).)
Program EIRs indicate a "tiering" of environmental analysis. The process of "tiering" "refers to the coverage of general matters in broader EIRs ... with subsequent narrower EIRs or ultimately site-specific EIRs incorporating by reference the general discussions and concentrating solely on the issues specific to the EIR subsequently prepared." (CEQA Guidelines, § 15385; see § 21068.5.) "Tiering is appropriate when the sequence of EIRs is: [¶] (a) From a general plan, policy, or program EIR to a program, plan, or policy EIR of lesser scope or to a site-specific EIR. [¶] (b) From an EIR on a specific action at an early stage to a subsequent EIR or a supplement to an EIR at a later stage. Tiering in such cases is appropriate when it helps the lead agency to focus on issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe." (CEQA Guidelines, § 15385; see § 21093.)
"[O]nce a general project impact has been analyzed in the broadest first-tier EIR, the agency saves time and resources by relying on that first-tier analysis in later, more specific environmental analysis documents, provided of course that passage of time or factors peculiar to the later project phase do not render the first-tier analysis inadequate. (See § 21083.3 [limited analysis required for development project consistent with general or community plan that was subject of earlier EIR]; CEQA Guidelines, Cal.Code Regs., tit. 14, § 15152, subds. (d)-(f).)" (Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova (2007) 40 Cal.4th 412, 431, fn. 7, 53 Cal. Rptr.3d 821, 150 P.3d 709.) "Tiering is *131 properly used to defer analysis of environmental impacts and mitigation measures to later phases when the impacts or mitigation measures are not determined by the first-tier approval decision but are specific to the later phases." (Id. at p. 431, 53 Cal.Rptr.3d 821, 150 P.3d 709.) "While proper tiering of environmental review allows an agency to defer analysis of certain details of later phases of long-term linked or complex projects until those phases are up for approval, CEQA's demand for meaningful information `is not satisfied by simply stating information will be provided in the future.' [Citation.] As the CEQA Guidelines explain: `Tiering does not excuse the lead agency from adequately analyzing reasonably foreseeable significant environmental impacts of the project and does not justify deferring such analysis to a later tier EIR or negative declaration.' ([CEQA Guidelines,] § 15152, subd. (b).)" (Ibid.) "Where a lead agency is using the tiering process in connection with an EIR for a large-scale planning approval, ... the development of detailed, site-specific information may not be feasible but can be deferred, in many instances, until such time as the lead agency prepares a future environmental document in connection with a project of more limited geographical scale, as long as deferral does not prevent adequate identification of significant effects of the planning approval at hand." (CEQA Guidelines, § 15152, subd. (c).)
The purpose of CEQA is to "compel government at all levels to make decisions with environmental consequences in mind." (Bozung v. Local Agency Formation Com. (1975) 13 Cal.3d 263, 283, 118 Cal.Rptr. 249, 529 P.2d 1017.) "CEQA's fundamental objective is `to ensure "that environmental considerations play a significant role in governmental decision-making."' (Fullerton Joint Union High School Dist. v. State Bd. of Education (1982) 32 Cal.3d 779, 797[, 187 Cal.Rptr. 398, 654 P.2d 168])" (Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn., supra, 42 Cal.3d at p. 935, 231 Cal.Rptr. 748, 727 P.2d 1029.)
"The EIR has been aptly described as the `heart of CEQA.' [Citations.]" (Citizens of Goleta Valley v. Board of Supervisors (1990) 52 Cal.3d 553, 564, 276 Cal.Rptr. 410, 801 P.2d 1161; see CEQA Guidelines, § 15003, subd. (a).) "An environmental impact report is an informational document which, when its preparation is required by [CEQA], shall be considered by every public agency prior to its approval or disapproval of a project." (§ 21061.) The purpose of EIRs is "to inform the public and its responsible officials of the environmental consequences of their decisions before they are made." (Citizens of Goleta Valley v. Board of Supervisors, supra, 52 Cal.3d at p. 564, 276 Cal.Rptr. 410, 801 P.2d 1161, italics added; see § 21061.) "A fundamental purpose of an EIR is to provide decision makers with information they can use in deciding whether to approve a proposed project, not to inform them of the environmental effects of projects that they have already approved." (Laurel Heights Improvement Assn. v. Regents of University of California (1988) 47 Cal.3d 376, 394, 253 Cal. Rptr. 426, 764 P.2d 278.)
In addition to identifying the significant environmental effects of a project, two of the specific purposes of an EIR are "to identify alternatives to the project" and "to indicate the manner in which those significant effects can be mitigated or avoided." (§ 21002.1, subd. (a); see §§ 21061, 21100; CEQA Guidelines, § 15362.) "Under CEQA, a public agency must ... consider measures that might mitigate a project's adverse environmental impact, and adopt them if feasible. (§§ 21002, 21081.)" (Mountain Lion *132 Foundation v. Fish & Game Com. (1997) 16 Cal.4th 105, 123, 65 Cal.Rptr.2d 580, 939 P.2d 1280.). "[A] decisionmaking agency is prohibited from approving a project for which significant environmental effects have been identified unless it makes specific findings about alternatives and mitigation measures. (§ 21081; see also Environmental Council v. Board of Supervisors (1982) 135 Cal.App.3d 428, 439[, 185 Cal.Rptr. 363])" (Id. at p. 134, 185 Cal.Rptr. 363.) "The requirement ensures there is evidence of the public agency's actual consideration of alternatives and mitigation measures, and reveals to citizens the analytical process by which the public agency arrived at its decision. [Citations.] Under CEQA, the public agency bears the burden of affirmatively demonstrating that, notwithstanding a project's impact on the environment, the agency's approval of the proposed project followed meaningful consideration of alternatives and mitigation measures. [Citation.]" (Ibid.)
A public agency must "provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures. Conditions of project approval may be set forth in referenced documents which address required mitigation measures or, in the case of the adoption of a plan, policy, regulation, or other public project, by incorporating the mitigation measures into the plan, policy, regulation, or project design." (§ 21081.6, subd. (b).) The public agency must "adopt a reporting or monitoring program for the changes made to the project or conditions of project approval, adopted in order to mitigate or avoid significant effects on the environment. The reporting or monitoring program shall be designed to ensure compliance during project implementation." (§ 21081.6, subd. (a)(1).)
In this case, the amended petition's allegations, which we must accept as true for purposes of demurrer, and the properly noticed official acts[12] suggest that respondents County and Board viewed development of the S1 and C1 trails as distinct subsequent activities or smaller projects under the program EIRs subject to separate environmental review and approval, they determined any environmental review of a site-specific C1 trail route was premature, and they conducted environmental review of only the proposed *133 subsequent activities concerning the S1 trail alignment. Those allegations also indicate that the trails agreement did not entirely conform to GUP Condition I.2 with respect to the C1 trail alignment and in effect modified the permit condition and the larger development project authorized by the GUP. It appears that the Committee may be able to allege facts showing that the proposed changes with respect to the C1 trail alignment were sufficiently substantial to require an EIR subsequent or supplemental to the GUP EIR. (See § 21166; CEQA Guidelines, §§ 15162-15163; see also CEQA Guidelines, § 15064, subd. (f)(7) ["The provisions of [CEQA Guidelines] sections 15162, 15163, and 15164 apply when the project being analyzed is a change to, or a further approval for, a project for which an EIR ... was previously certified"]; cf. Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra, 40 Cal.4th at p. 438, 53 Cal.Rptr.3d 821, 150 P.3d 709 ["To the extent a subsequent subdivision proposal relies on different water sources than were proposed in the specific plan it implements, or the likely availability of the intended water sources has changed between the time of the specific plan and the subdivision application (or more has been learned about the impacts of exploiting those sources), changes in the project, the surrounding circumstances or the available information would exist within the meaning of section 21166, requiring additional CEQA analysis under that section"]; Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn., supra, 42 Cal.3d at p. 937, 231 Cal.Rptr. 748, 727 P.2d 1029 [some changes allegedly made in a stadium project by a contract between a district and a builder "could be characterized as substantial enough to require the district to file a subsequent EIR to assess their environmental effects"].) In addition, the Committee may be able to state facts indicating that the proposed subsequent activities with regard to the C1 trail alignment should have been examined in light of the program EIRs to determine whether the activities were within the scope of the project covered by the program EIRs and whether those activities had potential environmental effects not fully examined in those EIRs and a new initial study leading to either another EIR or a negative declaration should have been prepared prior to any discretionary approval of those activities. (CEQA Guidelines, §§ 15162, 15168.)
The noticed documents do not negate any critical allegations of the amended petition. If anything, they support them. Even though the revised notice of determination stated in preprinted language that "[a]n Environmental Impact Report has been prepared for this project pursuant to the provisions of CEQA" and "[t]he project will not have a significant effect on the environment," the comments in the "project description" section of the revised notice of determination, as well as in the Board's resolution, reasonably imply that the County and its Board formally determined that the time was not yet ripe for environmental review with respect to the C1 trail alignment activities and no CEQA review was conducted with respect to those activities. The noticed documents do not disclose any determination that the potential environmental impacts of the changes regarding the C1 trail alignment had been already analyzed at the programmatic level or any recognition that approval of changes to a project already approved may itself constitute approval of a project subject to CEQA and necessitate further environmental review.
Nevertheless, we recognize that a statute of limitation "operates conclusively across-the-board ... with respect to all causes of action" regardless of merit. *134 (Norgart v. Upjohn Co. (1999) 21 Cal.4th 383, 410, 87 Cal.Rptr.2d 453, 981 P.2d 79.) "[T]he [CEQA] limitations period depends upon the nature of the alleged CEQA violation on which the governmental action is being challenged." (International Longshoremen's & Warehousemen's Union v. Board of Supervisors (1981) 116 Cal. App.3d 265, 271, 171 Cal.Rptr. 875.) The Committee is not asserting that any of the identified EIRs failed to comply with CEQA or that the significant effect determination regarding the S1 trail were improper. Thus, as framed by the amended petition, this is neither "[a]n action or proceeding alleging that a public agency has improperly determined whether a project may have a significant effect on the environment" (§ 21167, subd. (b)) nor "[a]n action or proceeding alleging that an environmental impact report does not comply with [CEQA]" (§ 21167, subd. (c)), which leaves subdivisions (a) and (e) of section 21167 since respondents do not dispute that subdivision (d) (projects not subject to CEQA) is inapplicable here. "In substance, subdivision (a) pertains to an action charging the public agency with approving or undertaking a project having a significant effect on the environment without any attempt to comply with CEQA ... and subdivision (e) is a catch-all provision governing an action based on any other failure of the public agency to comply with CEQA." (International Longshoremen's & Warehousemen's Union v. Board of Supervisors, supra, 116 Cal.App.3d at p. 271, 171 Cal.Rptr. 875.)
Subdivisions (d) and (e) were added to section 21167 in 1974. (Stats.1974, ch. 56, § 3, p. 125.) The legislative history of Assembly Bill No. 2338 (1973-1974 Reg. Sess.), which amended sections 21108 and 211052 to require notices of determination whenever a public agency approves a project not subject to CEQA as well as amending section 21167, indicates that the bill's principal purpose was to shorten the time for challenging a determination that a project is not subject to CEQA. (See Assem. Com. on Planning and Land Use, Analysis of Assem. Bill No. 2338 (1973-1974 Reg. Sess.) June 11, 1973; Assem. Com. on Planning and Land Use, Analysis of Assem. Bill No. 2338 (1973-1974 Reg. Sess.) as amended June 29, 1973, August 15, 1973; Assem. Com. on Planning and Land Use, Addendum to Analysis of Assem. Bill No. 2338 (1973-1974 Reg. Sess.) as amended June 29, 1973, August 15, 1973; Assem. Com. on Planning and Land Use, Analysis of Assem. Bill No. 2338 (1973-1974 Reg. Sess.) as amended June 29, 1973, August 29,1973; Assem. Com. on Planning and Land Use, Addendum to Analysis of Assem. Bill No. 2338 (1973-1974 Reg. Sess.) as amended June 29, 1973, August 29, 1973; Agriculture and Services Agency, Enrolled Bill Rep. on Assem. Bill No. 2338 (1973-1974 Reg. Sess.) Feb. 26, 1974; Office of Planning and Research, Enrolled Bill Rep. on Assem. Bill No. 2338 (1973-1974 Reg. Sess.) Mar. 1, 1974; Department of Transportation, Enrolled Bill Rep. on Assem. Bill No. 2338 (1973-1974 Reg. Sess.) Mar. 1, 1974.)
As to the addition of subdivision (e) to section 21167, the Legislative Analyst's analysis of the bill states in part: "The bill also provides that all actions not otherwise specified in law alleging any omission or illegal activity or process under CEQA shall be commenced within 30 days of the date of filing certain required documents ...." (Legis. Analyst, Analysis of Assem. Bill No. 2338 (1973-1974 Reg. Sess.) as amended June 29, 1973, Sept. 10 1973, italics added; see also Legis. Analyst, Analysis of Assem. Bill No. 2338 (1973-1974 Reg. Sess.) as amended Jan. 21, 1974, January 28, 1974.) The Legislative Counsel's Digest for the bill, which is also indicative of legislative intent (People *135 v. Superior Court (Douglass) (1979) 24 Cal.3d 428, 434, 155 Cal.Rptr. 704, 595 P.2d 139), states in pertinent part that the bill "[p]rovides that any action or proceeding alleging that any act or omission of a public agency does not comply with the provisions of [CEQA], except for certain specific actions or proceedings, shall be commenced within 30 days after required filing of notice." (Legis. Counsel's Digest of Assembly Bill No. 2338 (1973-1974 Reg. Sess.) 2 Stats.1974, Summary Dig., p. 12, italics added.)
The above descriptions are consistent with the language of section 21167, subdivision (e), which applies to "[a]n action or proceeding alleging that another act or omission of a public agency does not comply with [CEQA]...." (Italics added.) "Another" in this context most reasonably means "different or distinct from the one first named or considered." (Webster's Third New International Dictionary, unabridged (1993 ed.) p. 89), that is those actions or proceedings specified in subdivisions (a) through (d) of section 21167. Thus, if this proceeding comes within the language of subdivision (a), the 30-day limitation period under subdivision (e) is inapplicable even if a notice of determination was filed.
We recognize that one of the enrolled bill reports stated: "[T]his bill provides for a 30-day statute of limitation on any discretionary determination made by a public agency on a project if the basis of such challenge is either that there has been an improper determination on potential significant effects or that the prepared environmental impact report is inadequate. Thus, essentially any determinations made by public agencies under the Environmental Quality Act will be subject to a 30 or 35 day challenge limitation, provided a notice of determination has been filed. If no notice is filed or utilized, a 180-day period of limitation applies." (Water Resources Board, Enrolled Bill Rep. on Assem. Bill No. 2338 (1973-1974 Reg. Sess.) February 25, 1974.) While courts "have routinely found enrolled bill reports, prepared by a responsible agency contemporaneous with passage and before signing, instructive on matters of legislative intent" (Eisner v. Uveges (2004) 34 Cal.4th 915, 934, fn. 19, 22 Cal.Rptr.3d 530, 102 P.3d 915), we find this enrolled bill report unpersuasive since it conflicts with the language of the statute and is not echoed elsewhere in the legislative history.[13] (See People v. Garcia (2002) 28 Cal.4th 1166, 1172, 124 Cal. Rptr.2d 464, 52 P.3d 648 ["We look first to the plain meaning of the statutory language, giving the words their usual and ordinary meaning" and "[i]f there is no ambiguity in the statutory language, its plain meaning controls; we presume the Legislature meant what it said"].)
Furthermore, "when different words are used in contemporaneously enacted, adjoining subdivisions of a statute, the inference is compelling that a difference in meaning was intended." (People v. Jones (1988) 46 Cal.3d 585, 596, 250 Cal. Rptr. 635, 758 P.2d 1165.) The Legislature has demonstrated that it knows how *136 to explicitly impose a shorter limitations period for certain actions following the filing of a notice of determination and yet it did not expressly require "an action or proceeding alleging that a public agency ... has approved a project that may have a significant effect on the environment without having determined whether the project may have a significant effect on the environment" to be commenced within 30 days of the filing of a notice of determination. (Cf. § 21167, subds. (b)-(e).) The longer limitations period for challenging approvals lacking any determination of potential significant effect is entirely consistent with CEQA's fundamental purpose of compelling meaningful decision-making.
We conclude that there is a reasonable possibility that the Committee can allege facts sufficient to bring this proceeding within the purview of section 21167, subdivision (a), that is the Board approved changes and subsequent activities with respect to the C1 trail alignment that "may have a significant effect on the environment without having determined whether the project may have a significant effect on the environment ...."(§ 21167, subd. (a).) If we were to reach a contrary conclusion, we would not be interpreting the applicable law in a manner affording the fullest possible protection to the environment within the reasonable scope of the statutory language. (See Muzzy Ranch Co. v. Solano County Airport Land Use Com'n, supra, 41 Cal.4th at p. 381, 60 Cal.Rptr.3d 247, 160 P.3d 116 [A court must "bear in mind that `[t]he foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language"'"]; but see § 21083.1 [The Legislature's express intent is that "courts, consistent with generally accepted rules of statutory interpretation, shall not interpret this division or the state guidelines adopted pursuant to Section 21083 in a manner which imposes procedural or substantive requirements beyond those explicitly stated in this division or in the state guidelines"].)
Lastly, even though Committee attempts to characterize the County's obligation to enforce GUP condition 1.2 as a present and continuing duty enforceable through a writ of mandamus, it is in essence a CEQA claim as well. Under the allegations of the amended petition, the Board's resolution must be viewed a de facto modification of that permit condition and the only alleged basis for the resolution's invalidity is the Board's failure to conduct environmental review of the proposed changes with respect to the C1 trail alignment. Consequently, the claim that respondents County and Board have a mandatory duty to enforce the original permit condition is likewise subject to the limitations period set forth by section 21167, subdivision (a), under the facts alleged.
Of course, our conclusion that this proceeding is not necessarily time-barred does not imply any view as to its substantive merits.

E. Government Code Section 65009

Respondents argued below that the 90-day statute of limitation set forth in Government Code section 65009, subdivision (c), barred the Committee's attack on the Board's decision as to how to implement GUP Condition 1.2. With an exception not here applicable, Government Code section 65009, subdivision (c)(1), provides in pertinent part: "[N]o action or proceeding shall be maintained in any of the following cases by any person unless the action or proceeding is commenced and service is made on the legislative body within 90 days after the legislative body's *137 decision: ... [¶] (E) To ... determine the reasonableness, legality, or validity of any condition attached to a variance, conditional use permit, or any other permit."[14]
We begin by noting that the Committee was not actually challenging "the reasonableness, legality, or validity" of GUP Condition I.2 (see Gov.Code, § 65009, subd. (c)(1)(E)) but rather it was attacking the validity of the Board's resolution that Stanford's contractual commitments under the trails agreement in fact satisfied the permit condition. Moreover, even assuming that Government Code section 65009, subdivision (c)(1)(E), reasonably could be construed as encompassing a resolution adopted to ostensibly implement a permit condition, section 21167 would nevertheless control here because that statute is specifically applicable to CEQA claims.
It is a well settled rule of statutory construction that "[a] specific provision relating to a particular subject will govern in respect to that subject, as against a general provision, although the latter, standing alone, would be broad enough to include the subject to which the more particular provision relates." (Rose v. State of California (1942) 19 Cal.2d 713, 724, 123 P.2d 505; Code Civ.Proc, § 1859 ["when a general and particular provision are inconsistent, the latter is paramount to the former"].) This principle is fully applicable to statutes of limitations. (See Committee for a Progressive Gilroy v. State Water Resources Control Bd. (1987) 192 Cal. App.3d 847, 859, 237 Cal.Rptr. 723.) We conclude that the Committee's claims, being in essence all CEQA claims, are governed by the CEQA statute of limitations rather than the more general provisions of Government Code section 65009.
The judgment of dismissal is reversed. Upon remand, the superior court shall vacate its order sustaining a demurrer without leave to amend and issue an order sustaining a demurrer with leave to amend.
WE CONCUR: RUSHING, P.J., and PREMO, J.
NOTES
[1] All further statutory references are to the Public Resources Code unless otherwise stated.
[2] The university and its Board of Trustees are named as the real parties in interest.
[3] CEQA requires a lead agency to "consider comments it receives on a draft environmental impact report, proposed negative declaration, or proposed mitigated negative declaration if those comments are received within the public review period" and to prepare a written response to comments received on a draft environmental impact report. (§ 21167, subd. (d); see Cal.Code Regs., tit. 14, § 15088 [hereafter Cal.Code Regs., tit. 14, § 15000 et seq.] will be referred to as CEQA Guidelines, see fn. 8, ante.)
[4] This court granted the Committee's request to take judicial notice of the Santa Clara County Planning Office's Annual Report No. 5, prepared by the County of Santa Clara Planning Office, May 2006, which is a report on Stanford's development activity and compliance with GUP conditions. (Evid.Code, §§ 452, subd. (c), 459.) In Appendix B, "GUP Conditions and Compliance Activities," the report noted in regard to Condition 1.2 that the County approved the trails agreement with respect to the C1 and C2 trail routes but the agreement did not constitute "County approval of construction, operation or maintenance of specific trail improvements along these routes" and other jurisdictions would review and exercise their discretion regarding these trails.
[5] The trial court additionally found that the declaratory relief action failed because the declaratory relief action "simply repeats the claim of a CEQA violation" and declaratory relief "will not lie to determine issues raised in other causes of action before the Court." A declaratory relief cause of action does not fail to state a cause of action merely because it duplicates the claims made in another cause of action. (See Code Civ. Proc., § 1062 ["The remedies provided by this chapter are cumulative, and shall not be construed as restricting any remedy, provisional or otherwise, provided by law for the benefit of any party to such action, and no judgment under this chapter shall preclude any party from obtaining additional relief based upon the same facts"]; Ermolieff v. R.K.O. Radio Pictures (1942) 19 Cal.2d 543, 547, 122 P.2d 3 ["Neither the fact that a party has another remedy nor that a breach has occurred prior to the commencement of his action compels the court to deny relief. Ordinarily, the alternative remedy, such as damages, injunctive relief and the like would be more harsh, and if he chooses the milder remedy, declaratory relief, the court is not required for that reason to compel him to seek a more stringent one"]; see also Columbia Pictures Corp. v. De Toth (1945) 26 Cal.2d 753, 761, 161 P.2d 217 ["The remedies provided by the statute are cumulative and declaratory relief may be asked alone or with other relief, Code Civ. Proc. §§ 1060-1062"].) If a pleading states facts sufficient to constitute a claim for mandamus or injunctive relief based upon violation of CEQA, those facts also should be sufficient to state an action for declaratory relief. We recognize, however, that a court may, under Code of Civil Procedure section 1061, exercise its discretion to refuse to provide declaratory relief "where its declaration or determination is not necessary or proper at the time under all the circumstances" and this discretionary authority may be applied on demurrer. (See Moss v. Moss (1942) 20 Cal.2d 640, 642-643, 128 P.2d 526 ["Where facts appear from the face of the complaint which would justify a trial court in concluding that its determination is not necessary or proper," a court may exercise its discretion under section 1061 of the Code of Civil Procedure]; see also Lord v. Garland (1946) 27 Cal.2d 840, 852, 168 P.2d 5; General of America Ins. Co. v. Lilly (1968) 258 Cal.App.2d 465, 471, 65 Cal.Rptr. 750; California Ins. Guarantee Assn. v. Superior Court (1991) 231 Cal.App.3d 1617, 1624, 283 Cal.Rptr. 104; cf. Maguire v. Hibernia S. & L. Soc. (1944) 23 Cal.2d 719, 732, 146 P.2d 673 [no circumstances appeared on face of the complaint indicating that declaratory relief was not "necessary or proper"].) The appellate record, however, does not demonstrate that the superior court was exercising its discretion under Code of Civil Procedure section 1061 but rather indicates that the court improperly concluded that appellant had failed to state a cause of action because the declaratory relief action was duplicative.
[6] A "project" under CEQA encompasses "the whole of the action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect change in the environment...." (CEQA Guidelines, § 15378, subd. (a); § 21065.) The term "project" includes an activity involving issuance of a permit by one or more public agencies and "[a]n activity undertaken by a person [that is] supported in whole or in part through public agency contracts...." (CEQA Guidelines, § 15378, subds. (a)(2) and (a)(3); § 21065.) "Project" refers to the activity which is being approved. (CEQA Guidelines, § 15378, subd. (c).) A project may encompass a related series of actions that can be characterized as one larger project (see CEQA Guidelines, § 15168, subd. (a) [Program EIR]; see also CEQA Guidelines, § 15167 [Staged EIR]) or a project may consist of smaller individual projects that will be carried out in phases (see CEQA Guidelines, § 15175, subd. (a) [Master EIR]; see also § 21157 et seq. [same].)
[7] Subdivision (d) of section 21167 states: "An action or proceeding alleging that a public agency has improperly determined that a project is not subject to this division pursuant to subdivision (b) of Section 21080 [exemptions] or Section 21172 [disasters] shall be commenced within 35 days from the date of the filing by the public agency, or person specified in subdivision (b) or (c) of Section 21065, of the notice authorized by subdivision (b) of Section 21108 [state agency] or subdivision (b) of Section 21152 [local agency]. If the notice has not been filed, the action or proceeding shall be commenced within 180 days from the date of the public agency's decision to carry out or approve the project, or, if a project is undertaken without a formal decision by the public agency, within 180 days from the date of commencement of the project."
[8] "The term `CEQA Guidelines' refers to the regulations for the implementation of CEQA authorized by the Legislature (Pub. Resources Code, § 21083), codified in title 14, section 15000 et seq. of the California Code of Regulations, and `prescribed by the Secretary of Resources to be followed by all state and local agencies in California in the implementation of [CEQA].' (CEQA Guidelines, § 15000.) In interpreting CEQA, we accord the CEQA Guidelines great weight except where they are clearly unauthorized or erroneous. (Citizens of Goleta Valley v. Board of Supervisors (1990) 52 Cal.3d 553, 564, fn. 3[, 276 Cal.Rptr. 410, 801 P.2d 1161])" (Muzzy Ranch Co. v. Solano County Airport Land Use Com'n (2007) 41 Cal.4th 372, 380, fn. 2, 60 Cal.Rptr.3d 247, 160 P.3d 116.)
[9] "With private projects, approval occurs upon the earliest commitment to issue or the issuance by the public agency of a discretionary contract, grant, subsidy, loan, or other form of financial assistance, lease, permit, license, certificate, or other entitlement for use of the project." (CEQA Guidelines, § 15352, subd. (b).) The issue of whether an agreement constitutes an approval of a project requiring CEQA environmental review has previously arisen in a variety of contexts. (See. e.g. Citizens For A Megaplex-Free Alameda v. City of Alameda (2007) 149 Cal.App.4th 91, 106-108, 56 Cal.Rptr.3d 728 [City council's adoption of resolution authorizing execution of development agreement constituted "approval" of theater project]; County of Amador v. City of Plymouth (2007) 149 Cal. App.4th 1089, 1103-111.1, 57 Cal.Rptr.3d 704 [municipal services agreement requiring City to take certain actions facilitating Indian gaming development constituted approval of project]; Concerned McCloud Citizens v. McCloud Community Services Dist. (2007) 147 Cal.App.4th 181, 192-197, 54 Cal.Rptr.3d 1 [District's approval of conditional agreement with private bottling company for the development and use of the District's, springs as a spring water source and construction of a bottling facility did not constitute approval of a project within the meaning of CEQA because the agreement was expressly not binding until the District completely complied with CEQA and there was no possibility of a CEQA challenge}; Santa Margarita Area Residents Together v. San Luis Obispo County Bd. of Supervisors (2000) 84 Cal.App.4th 221, 229, 100 Cal.Rptr.2d 740 [development agreement between county and landowner constitutes approval of a project because "it commits the parties to a definite course of action aimed at assuring construction of the Project, provided certain contingencies are met"]; see also County of Amador v. El Dorado County Water Agency (1999) 76 Cal.App.4th 931, 963-965, 91 Cal.Rptr.2d 66 [Irrigation District's resolution did not constitute project approval because it merely authorized negotiations regarding proposed purchase of a hydroelectric project and did not legally bind the district to a particular course of action and consequently notice of exemption was premature and invalid].)
[10] A "negative declaration" is "a written statement briefly describing the reasons that a proposed project will not have a significant effect on the environment and does not require the preparation of an environmental impact report." (§ 21064; see CEQA Guidelines, § 15371; see also § 21080, subd. (c).) A "mitigated negative declaration" is "a negative declaration prepared for a project when the initial study has identified potentially significant effects on the environment, but (1) revisions in the project plans or proposals made by, or agreed to by, the applicant before the proposed negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur, and (2) there is no substantial evidence in light of the whole record before the public agency that the project, as revised, may have a significant effect on the environment." (§ 21064.5; see CEQA Guidelines, § 15369.5) "`Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." (§ 21068; see CEQA Guidelines 15382.)
[11] An EIR is "a detailed statement prepared under CEQA describing and analyzing the significant environmental effects of a project and discussing ways to mitigate or avoid the effects." (CEQA Guidelines, § 15362; see §§ 21061,21100.)
[12] It is imperative to keep in mind that "[w]hile courts may notice official acts and public records, `we do not take judicial notice of the truth of all matters stated therein.' [Citations.]" (Mangini v. R.J. Reynolds Tobacco Co. (1994) 7 Cal.4th 1057, 1063, 31 Cal.Rptr.2d 358, 875 P.2d 73, overruled on another ground in In re Tobacco Cases II (2007) 41 Cal.4th 1257, 1276, 63 Cal.Rptr.3d 418, 163 P.3d 106.) "Generally, when there is `multiple hearsay, the question is whether each hearsay statement fell within an exception to the hearsay rule. (Evid.Code, § 1201.)' (People v. Reed [(1996)] 13 Cal.4th [217,] 224-225[, 52 Cal.Rptr.2d 106, 914 P.2d 184].)" (People v. Woodell (1998) 17 Cal.4th 448, 458-459, 71 Cal.Rptr.2d 241, 950 P.2d 85.) "[M]ultiple hearsay is admissible for its truth only if each hearsay layer separately meets the requirements of a hearsay exception. (Evid.Code, §§ 1200, 1201.)" (People v. Arias (1996) 13 Cal.4th 92, 149, 51 Cal. Rptr.2d 770, 913 P.2d 980.) Thus, while courts properly may take judicial notice of official acts, including the official acts of a county (see Evid.Code, § 452, subd. (c); Cruz v. County of Los Angeles (1985) 173 Cal. App.3d 1131, 1134, 219 Cal.Rptr. 661; see also Oceanside Marina Towers Assn v. Oceanside Community Development Com. (1986) 187 Cal.App.3d 735, 740, fn. 3, 231 Cal.Rptr. 910 [judicial notice taken that notice of determination was filed on particular date]), judicial notice "goes to the authenticity and contents of the documents, not to the absolute truth of their contents." (Gilbert v. State of California (1990) 218 Cal.App.3d 234, 241, fn. 5, 266 Cal.Rptr. 891.)
[13] This enrolled bill report also erroneously stated: "Under the present Guidelines and the CEQA, only the negative declaration determination is subject to the requirement of filing a notice and the benefit of a 30-day limitation for challenging such a finding." (Water Resources Board, Enrolled Bill Rep. on Assem. Bill No. 2338 (1973-1974 Reg. Sess.) February 25, 1974.) In fact, as originally enacted, section 21167 required actions either alleging that "a public agency has improperly determined whether a project may have a significant effect on the environment" or alleging that "an environmental impact report does not comply with [CEQA]" to be commenced within 30 days after the notice of determination was filed. (Stats.1972, ch. 1154, § 16, p. 2278.)
[14] Government Code section 65009, subdivision (c)(1)(E), also provides a 90-day limitation period for actions or proceedings to "attack, review, set aside, void, or annul any decision on the matters listed in Sections 65901 and 65903." Government Code section 65901 concerns decisions by a board of zoning adjustment or zoning administrator on permit and variance applications and permits the local legislative body to authorize, by ordinance, "the board of zoning adjustment or zoning administrator' to decide applications for variance from the terms of the zoning ordinance without a public hearing on the application." Government Code section 65903 relates to the authority of a board of appeals, created and established by local ordinance, to "hear and determine appeals from the decisions of the board of zoning adjustment or the zoning administrator." Respondents do not suggest that this portion of section 65009 applies here.